STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DAVID FRITZ, DEFENDANT-APPELLANT.

Argued September 9, 1986—Decided January 14, 1987.

*Patricia Anne Kern,* Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney.)

*Marijean Raffetto Stevens,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney.)

The opinion of the Court was delivered by

HANDLER, Justice.

Defendant, David Fritz, seeks reversal of his convictions for second-degree aggravated assault and third-degree unlawful possession of a handgun. He asserts that the trial court's refusal to grant a continuance of the trial prevented his attorney from adequately preparing a defense and, consequently, deprived defendant of constitutionally adequate representation by counsel. The issue posed by defendant's appeal compels us to re-examine the standards that govern a criminal defendant's

entitlement to the effective representation of counsel under both the sixth amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution.

## I.

This appeal arises out of an altercation between Newark Special Police Officer Daryl Armstrong and a group of youths, one of whom was defendant David Fritz. As a result, defendant was indicted on November 18, 1980, for second-degree aggravated assault, *N.J.S.A.* 2C:12–1b(1); first-degree robbery, *N.J.S.A.* 2C:15–1; and third degree unlawful possession of a handgun, *N.J.S.A.* 2C:39–5b. In order to resolve the issues on appeal, we must first carefully examine the surrounding facts.

It is undisputed that on the night of September 2, 1980, Armstrong was armed and working in uniform as a security guard at Gino's, a fast food restaurant located on Park Avenue between Fifth and Sixth Streets in Newark. R.J., a juvenile, entered the establishment and asked in a vulgar manner to use the bathroom. Armstrong testified that while leaving the restaurant, R.J. uttered obscenities and threatened to take the officer's gun. Armstrong asked R.J. to leave and followed him out the door of the restaurant to the parking lot.

Defendant and his friends, members of a group called "The Assassins," were walking through the parking lot at this time. R.J. was standing in front of Gino's with Armstrong when he called to this group for help. Defendant Fritz and codefendant Miller approached R.J. and the officer and inquired as to the problem. Armstrong informed them that R.J. had been using obscene language and that he wanted R.J. to leave the restaurant. R.J.'s response was to turn around, drop his pants, and expose his buttocks to Armstrong. This action provoked laughter from R.J.'s friends. Armstrong then attempted to arrest R.J. for indecent exposure and for being a disorderly person.

The events subsequent to Armstrong's attempt to arrest R.J. are disputed. At the probable cause hearing, held one month

after the incident, Armstrong testified that as he grabbed at R.J. in order to arrest him, codefendant Miller hit him, knocking his glasses off. This enabled R.J. to grab Armstrong's nightstick and hit him with it. Armstrong responded to this assault by R.J. and Miller by drawing his gun. Armstrong testified that defendant Fritz immediately grabbed the gun from his hand. However, an inconsistency arises over what took place next. At the probable cause hearing, when asked if defendant pointed the gun at him, Armstrong replied:

> A. He was, uh, turning around to point the gun at me and I caught him on the half turn and grabbed the gun out of his hand. At that point, that was when it fired.
>
> Q. All right, did he—he was attempting to point the gun at you?
>
> A. I would say so.

Armstrong also stated explicitly that defendant Fritz did not strike him:

> Q. Other than that contact which you had with him, that physical contact, by which he gained possession of the gun and thereafter you repossessed it, is there any other contact that you two had?
>
> In other words, did he in any way assault you or make physical contact.
>
> A. Did he assault me?
>
> Q. Other than at the time he went to grab your gun?
>
> A. No, he didn't.

Based upon the testimony of Special Officer Armstrong, the court dismissed the charge of aggravated assault, determining that "testimony is lacking with respect to any specific aggravated assault on Officer Armstrong by reason of specifically punching him or hitting him about the body."[1] The court found sufficient evidence, however, to support charges of robbery and possession of a weapon.

In contrast to his testimony at the probable cause hearing, Armstrong testified at trial that "there was no doubt" in his mind that both Fritz *and* Miller had been punching him when he drew his gun. In addition, with respect to what defendant

---

[1]Subsequently, however, the Grand Jury returned an indictment charging defendant with second-degree aggravated assault contrary to *N.J.S.A.* 2C:12-1b(1).

Fritz did with the gun for the brief period it was under his control, Officer Armstrong asserted at trial:

Q. What did David Fritz do with the gun after he got it out of your hand?
A. He turned and pointed it at me.
Q. Where [on] your body did he point the gun?
A. I would say my chest area.

Codefendant Miller's witness, Carl Middleton, testified at trial to yet another story. He was with Fritz and Miller in the parking lot, but did not go forward with them to engage Armstrong. Whereas Armstrong testified that there was one unidentified assailant involved in the altercation, Middleton placed the number at two or more. Moreover, Middleton testified that it was these unidentified individuals who actually hit Armstrong. Middleton stated that Fritz neither hit Armstrong nor grabbed at his gun, but was trying to remove himself from the fray when he tripped over a ledge in the sidewalk and fell near a parked car. Armstrong then broke free from the person holding him, drew his gun, and fired in Fritz's direction.

At this point the various accounts converge. R.J. and the unidentified assailant(s) fled at the sound of the gunshot, and Armstrong arrested Fritz and Miller. The police arrived shortly thereafter. One of the responding police officers, Officer Price, prepared an incident report based on information supplied by Armstrong. Significantly, Price testified that the report contained no indication that Fritz had hit Armstrong, and that Armstrong had reviewed the report and made no changes.

Following his arrest, defendant had only sporadic contact with the Public Defender's Office prior to trial. The Office opened a file on his behalf in November of 1982. Francis Meehan, Esq., who was ultimately to represent defendant at trial, spoke to him the next month about a proffered plea bargain, which defendant refused. The case was then assigned to Richard Aljian, Esq., of the Public Defender's Office. At this point, however, communications broke down. Nothing further was done on the case until Mr. Meehan received a trial notice on April 28, 1983 setting the trial date as Monday, May 9.

It was not until the Friday preceding the Monday date that Mr. Meehan learned that the trial was actually going forward on schedule.

On the first morning of trial, Mr. Meehan requested a continuance on the ground that he was unprepared to try the case. He told the court that he had had his first serious discussion with defendant that very morning. In addition, counsel had neither ordered a copy of the probable cause transcript nor contacted witnesses. The trial court noted that Mr. Meehan was assigned to the court, and that defendant had not come forward to contact counsel with names of witnesses in the two and a half years since his arraignment. Further noting that the first day was only for jury selection, the court stated, "So you will have this evening and tomorrow until nine o'clock to do whatever you are able to do." The trial proceeded the next day, May 10, and concluded on May 12, 1983. The jury found defendant guilty of second-degree aggravated assault, second-degree robbery (a lesser-included offense), and third-degree possession of a handgun. On June 17, 1983, the trial court heard and denied defendant's motions for judgment of acquittal notwithstanding the verdict and for a new trial. Defendant was sentenced on August 12, 1983, to concurrent ten-year terms of imprisonment with three-year periods of parole ineligibility for the aggravated assault and robbery convictions, and a concurrent five-year term for the possession count.

The Appellate Division reversed defendant's conviction for robbery because the evidence, "once fully developed at trial," did not support it. However, a majority of the court affirmed defendant's other convictions in the face of defendant's allegation that he had received ineffective assistance of counsel at trial. The court held that the representation defendant received occasioned "no realistic prejudice to defendant's case or to the true interest of justice." On this point, one judge dissented, stating, "[d]efendant's claim of ineffective assistance of counsel should have been accepted, not due to any lack of counsel's diligence or legal ability, * * * but because defendant

was forced to trial in a situation where his attorney had insufficient time to prepare."

The "ineffective assistance of counsel" claim is before this Court as of right pursuant to *Rule* 2:2–1(a)(2).

## II.

Defendant's claim that he received ineffective assistance of counsel is based upon the particular circumstances surrounding the underlying incident. Defendant contends that he neither hit Armstrong nor grabbed for his gun, but was merely the target of a wild shot fired by Armstrong after the latter was publicly embarrassed by a group of youths. According to defendant, Armstrong's testimony at the probable cause hearing to the effect that defendant never actually hit him or pointed the gun at him provides support for his version of the altercation. Thus, defendant argues, the probable cause testimony was "potentially devastating" to Armstrong's credibility at trial. However, because defense counsel had such a brief time to prepare, he was unaware that there had been a probable cause hearing until well into the trial. Defendant claims that this failure to use Armstrong's prior statements for impeachment purposes deprived him of effective assistance of counsel, which prejudicially affected the outcome of the trial. Defendant also asserts that counsel's inadequate preparation time prevented him from contacting witnesses who could have aided in the defense. We consider these claims under both the federal and state constitutions, addressing first the appropriate substantive standard that governs a criminal defendant's entitlement to effective representation of counsel.

## A.

In order to evaluate defendant's claim of ineffective assistance of counsel under the federal Constitution, we must examine the United States Supreme Court's recent pronouncements in *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80

*L.Ed.*2d 674 (1984), and *United States v. Cronic,* 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984). These decisions cannot be fully appreciated, however, without first referring to the historical treatment of this constitutional right.

It has long been established under the federal Constitution that the right to effective, unhindered, assistance of counsel is among those "immutable principles of justice which inhere in the very idea of free government." *Powell v. Alabama,* 287 *U.S.* 45, 71–72, 53 *S.Ct.* 55, 65, 77 *L.Ed.* 158, 172 (1932) (quoting *Holden v. Hardy,* 169 *U.S.* 366, 389, 18 *S.Ct.* 383, 387, 42 *L.Ed.* 780, 790 (1897). *Powell* and other early cases relied solely on a fifth amendment due process standard to ensure that counsel was effective. *See, e.g., Betts v. Brady,* 316 *U.S.* 455, 62 *S.Ct.* 1252, 86 *L.Ed.* 1595 (1942), overruled by *Gideon v. Wainwright,* 372 *U.S.* 335, 83 *S.Ct.* 792, 9 *L.Ed.*2d 799 (1963). In *Johnson v. Zerbst,* 304 *U.S.* 458, 58 *S.Ct.* 1019, 82 *L.Ed.* 1461 (1938), however, the Supreme Court ruled that the sixth amendment's provision of the right to counsel applied to the states through the fourteenth amendment. As a result, the sixth amendment itself became a more important source influencing the constitutional right to the effective assistance of counsel.

This shift in perception as to the basis of the guarantee of effective representation also affected judicial views of its nature and scope. *See* W. Genego, "The Future of Effective Assistance of Counsel: "Performance Standards and Competent Representation," 22 *Am.Crim.L.Rev.* 181 (1984); Note, "A Functional Analysis of the Effective Assistance of Counsel," 80 *Colum.L.Rev.* 1053 (1980). Courts focusing on the fundamental fairness of a trial under the fifth amendment frequently evaluated counsel's performance under a "farce and mockery" standard, *see, e.g., Diggs v. Welch,* 148 *F.*2d 667 (D.C.Cir.), *cert.* denied, 325 *U.S.* 889, 65 *S.Ct.* 1576, 89 *L.Ed.* 2002 (1945) (first use of "farce and mockery" standard); *Trapnell v. United States,* 725 *F.*2d 149, 151 (2d Cir.1983) (by the time of *Gideon v. Wainwright* in 1963, the "farce and mockery" standard had been adopted by nine of the federal circuit courts). Under this

standard, the inquiry is whether the representation by counsel was such as to make the trial a farce and mockery of justice. However, reliance on the sixth amendment as the basis of the constitutional guarantee, especially after *Gideon v. Wainright, supra,* 372 *U.S.* 335, 83 *S.Ct.* 792, 9 *L.Ed.*2d 799, focused attention on the actual performance of counsel, and not simply on the fairness of the trial in its entirety. In the leading case of *Moore v. United States,* 432 *F.*2d 730 (1970), the Third Circuit rejected a "farce and mockery" standard grounded in notions of due process in favor of a "standard of normal competency" it found nascent in the sixth amendment. *Id.* at 737. The court made clear that "the ultimate issue is not whether a defendant was prejudiced by his counsel's act or omission, but whether counsel's performance was at the level of normal competency." *Id.; see also United States v. DeCoster,* 487 *F.*2d 1197, 1202 (D.C.Cir.1973) (adopting the general standard that "a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."). When the Second Circuit decided *Trapnell v. United States, supra,* 725 *F.*2d 149, in 1983, it became the last circuit court to reject "farce and mockery" in favor of some version of "reasonably competent assistance." Noting the shift in focus from the due process clause to the sixth amendment, and the policy of improving the quality of representation in federal courts, the court in *Trapnell* made unanimous the federal standard for evaluating claims of ineffective assistance of counsel.

The federal decisional law on the right to effective assistance of counsel was synthesized in *Strickland v. Washington, supra,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674. The Supreme Court there initially distinguished between two classes of right-to-counsel cases: cases "based on actual or constructive denial of the right to counsel altogether, including claims based on state interference with the ability of counsel to render effective assistance to the accused," *id.* at 683, 104 *S.Ct.* at 2062, 80 *L.Ed.*2d at 690; and cases in which counsel "simply

fail[ed] to render 'adequate legal assistance,' " or "actual ineffectiveness." *Id.* at 686, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 692.

The *Strickland* Court announced a simple, two-part test for evaluating claims of "actual ineffectiveness" of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.
>
> [*Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693.]

With respect to the performance prong of the test, the Court noted that client loyalty, adequate consultation, and legal proficiency are relevant in determining whether assistance was effective. It eschewed, however, any more specific test: "[N]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. The Court endorsed extreme deference in evaluating the performance of counsel, requiring "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Id.*

As to the second prong of the *Strickland* test, the Court ruled that in "actual ineffectiveness" cases, prejudice must be proved; it is not presumed. *Id.* at 692–93, 104 *S.Ct.* at 2067, 80 *L.Ed.*2d 696–97. Specifically, a defendant alleging actual ineffectiveness must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

The second prong of the *Strickland* test—the prejudicial effect of ineffective assistance of counsel—was further ampli-

fied in *United States v. Cronic, supra,* 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657, decided the same day as *Strickland.* The Court there held that in some ineffective assistance cases, prejudice to the defendant may be presumed. It stated that when there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified" a presumption of ineffectiveness is warranted. *Id.* at 658, 104 *S.Ct.* at 2046, 80 *L.Ed.*2d at 667. Such circumstances involve the complete denial of the right to counsel altogether, actual or constructive.

## B.

Before applying the *Strickland-Cronic* rule, as a matter of federal constitutional law, to the facts of this case, we turn next to the issue of a defendant's entitlement to counsel under the State Constitution. We do so in view of the established fact that the State Constitution is an independent basis for protectable rights. *State v. Williams,* 93 *N.J.* 39 (1983); *State v. Hunt,* 91 *N.J.* 338 (1982). We must decide whether the State Constitution accords greater protection than that secured by the federal Constitution, *e.g., State v. Novembrino,* 105 *N.J.* 95 (1987); *State v. Hunt, supra,* 91 *N.J.* 338; *State v. Alston,* 88 *N.J.* 211 (1981); *State v. Johnson,* 68 *N.J.* 349 (1975), or protections comparable to the federal Constitution, *e.g. State v. Gilmore,* 103 *N.J.* 508 (1986); *see State v. Williams, supra,* 93 *N.J.* 39.

Although the federal judiciary and many of the state courts have rejected the due process-based "farce and mockery" standard in favor of a "reasonable competence" test, *e.g., Trapnell, supra,* 725 *F.*2d at 151–52, this Court has yet to expressly reformulate or disavow the "farce and mockery" standard. In our first modern treatment of this issue, *State v. Williams,* 39 *N.J.* 471 (1963), *cert.* den., 382 *U.S.* 964, 86 *S.Ct.* 449, 15 *L.Ed.*2d 366 (1965), overruled on other grounds, *State v. Czachor,* 82 *N.J.*

392 (1980), we failed to enunciate a standard for evaulating attorney competence. Instead, we merely reiterated an oft-quoted corollary to ineffectiveness analysis, that complaints "merely of matters of trial strategy" will not serve to ground a constitutional claim of inadequacy of representation by counsel. *Id.* 39 *N.J.* at 489; *see State v. Knight*, 63 *N.J.* 187 (1973); *State v. Bonet*, 132 *N.J.Super.* 186 (App.Div.1975). *But see State v. Reddick*, 76 *N.J.Super.* 347 (App.Div.1962) (reversing conviction for robbery on ground that defense counsel argued before the jury that defendant was a crook, but not one so stupid as to commit the alleged crime).

*State v. Bentley*, 46 *N.J.Super.* 193 (App.Div.1957), is the first New Jersey case to expressly enunciate the "farce and mockery" standard. In *Bentley*, counsel's numerous errors, including his failure to interview witnesses, were held insufficient to make out a claim of ineffective assistance. The court stated that "[u]nless the purported representation by counsel was such as to make the trial a farce and mockery of justice, mere allegations of incompetency or inefficiency of counsel will not ordinarily suffice as grounds to vitiate the trial." *Id.* at 203. Until the decision in *Strickland*, the "farce and mockery" standard is cited in the vast majority of ineffective assistance cases in our jurisdiction. The Appellate Division in *State v. Pace*, 171 *N.J. Super.* 240 (1979), certif. den., 84 *N.J.* 384 (1980), noted that although the test "has been subjected to criticisms in other jurisdictions . . . it remains the test here." *Id.* at 251 n. 1. More recently, the "farce and mockery" standard was referred to as "long settled in this State." *State v. Coruzzi*, 189 *N.J.Super.* 273, 319–20 (App.Div.), certif. den., 94 *N.J.* 531 (1983).

However, in *State v. Dennis*, 43 *N.J.* 418 (1964), we articulated a slightly different test for determining ineffective assistance. There, defendant appealed his narcotics conviction on the ground that his trial counsel's failure to adequately pursue an entrap-

ment defense resulted in ineffective assistance. Noting the "distressing frequency" of such claims in collateral proceedings, we stated:

[I]f our adversary system is to function at all effectively, these may not be permitted to impair the binding nature of the proceedings, except in those rare instances where they are of such magnitude as to *thwart the fundamental guarantee of fair trial.*

[*Id.* at 428 (emphasis added).]

*See also State v. Hines,* 109 *N.J.Super.* 298, 304 (App.Div.), certif. den., 56 *N.J.* 248, *cert.* den. 400 *U.S.* 867, 91 *S.Ct.* 108, 27 *L.Ed.*2d 106 (1970) ("The test is, did [defendant] receive a fair trial?"); *State v. Reddick, supra,* 76 *N.J.Super.* at 352 ("fundamental justice" demands new trial).

Although defendant attempts to portray the case law in New Jersey as moving away from the "unduly narrow" "farce and mockery" standard in favor of a more liberal "fundamental fairness" approach, the standards have frequently been treated as equivalent by our courts. Both standards trace their origins to a due process evaluation of the fairness of the resulting trial. *See* Note, "Assistance of Counsel," *supra,* at 1054–1060 ("At least as traditionally applied, the 'farce and mockery' analysis focuses primarily on the fairness of the trial as a whole, instead of particular instances of attorney misconduct." *Id.* at 1059). Indeed, a number of cases have explicitly equated the two standards. In *State v. Edge,* 57 *N.J.* 580 (1971), this Court rejected an assertion that the trial counsel's performance was constitutionally inadequate. We quoted *Dennis, supra,* 43 *N.J.* at 478, for the proposition that ineffectiveness claims are measured against the "fundamental guaranty of a fair trial," and went on to state: "Putting it another way, to warrant reversal, defense counsel must have been so incompetent as to make the trial a farce or mockery of justice." (citing *State v. Bentley, supra,* 43 *N.J.Super.* at 203). *See also State v. Vassalluzzo,* 114 *N.J.Super.* 153, 155 (App.Div.), aff'd, 58 *N.J.* 227 (1971) (equating "fair trial" and "farce and mockery" standards); *State v. Woodard,* 102 *N.J.Super.* 419, 429 (App.Div.), certif.

den. 53 *N.J.* 64 (1968), *cert.* den., 395 *U.S.* 938, 89 *S.Ct.* 2004, 23 *L.Ed.*2d 453 (1969) (equating "fair trial" and "farce and mockery" standards).

Only twice prior to *Strickland* has a New Jersey court purported to apply a "reasonable competence" standard. In *State v. Anderson*, 117 *N.J.Super.* 507 (App.Div.1971), modified on other grounds, 60 *N.J.* 437 (1972), the court held that "[a] defendant is entitled to a standard of adequacy of legal services equal to the exercise of normal customary skill and knowledge." *Id.* at 519; *see also State v. Marrero*, 155 *N.J.Super.* 567, 570 (App.Div.1978) (trial counsel departed from "the accepted standard of competence demanded of attorneys in criminal cases"); *cf. State v. Sugar*, 84 *N.J.* 1, 17 (1980) (without applying standard, court notes that counsel must be "reasonably competent").

Following *Strickland* and *Cronic*, almost all ineffective assistance cases addressed by the Appellate Division have been resolved exclusively on the basis of those decisions, ignoring prior New Jersey law on the subject. *See, e.g., State v. Chung*, 210 *N.J.Super.* 427, 434 (App.Div.1986); *State v. Merlino*, 208 *N.J.Super.* 147, 152 (App.Div.1984), certif. den., 103 *N.J.* 460 (1986); *State v. Childs*, 204 *N.J.Super.* 639, 645–46 (App. Div.1985), certif. den., 104 *N.J.* 430 (1986); *State v. Furguson*, 198 *N.J.Super.* 395, 407 (App.Div.), certif. den., 101 *N.J.* 266 (1985); *State v. Ortega*, 198 *N.J.Super.* 161, 164–65 (App. Div.1985); *State v. Boyle*, 198 *N.J.Super.* 64, 66, n. 1 (App. Div.1984); *cf. State v. Rhoda*, 206 *N.J.Super.* 584, 596–97 (App. Div.1986) (citing to both *Strickland* and *State v. Woodard*, *supra*, 102 *N.J.Super.* 419, a "farce and mockery"/"fundamental fairness" case). In fact, the Appellate Division opinions in the case *sub judice*—both majority and dissent—rely on *Strickland* in evaluating defendant's ineffectiveness claim.

Regardless of the standard employed, our courts have consistently recognized that the mere presence of an attorney at trial does not satisfy the constitution. Rather "[t]he circumstances under which a lawyer provides counsel must not 'preclude the giving of effective aid in the preparation and trial of the case.'" *State v. Sugar, supra,* 84 *N.J.* at 17 [quoting *Powell v. Alabama, supra,* 287 *U.S.* at 71, 53 *S.Ct.* at 65, 77 *L.Ed.*2d at 172.] As we stated in *State v. Mingo,* 77 *N.J.* 576, 582 (1978), "it is essential that [the defense attorney] be permitted full investigative latitude in developing a meritorious defense on his client's behalf." These principles have been applied to allegations of ineffective assistance grounded in insufficient preparation time. *Compare State v. Giorgianni,* 189 *N.J. Super.* 220, 230 (App.Div.), certif. den., 94 *N.J.* 569 (1983) (five days considered sufficient to prepare for a reconsideration of sentence motion); *State v. Pace, supra,* 171 *N.J.Super.* at 251–52 (two weeks adequate for a stolen property trial) *with Jablonowski v. State,* 29 *N.J.Super.* 109 (App.Div.1953) (two-and-a-quarter hours to prepare for two-day *habeas corpus* trial inadequate) and *State v. Anderson, supra,* 117 *N.J.Super.* at 521 (forcing defendant to trial on the day he had first conferred with a defense attorney who had engaged in no other preparation was, by itself, "grievously" prejudicial).

The *de facto* adoption of the *Strickland* standard by our lower courts impliedly recognizes the paramountcy of the federal Constitution and acknowledges the possibility that this test is more protective than that posited by prior state law. However, *Strickland* itself made it clear that the Supreme Court did not intend this decision to compel state courts to make drastic changes in prior law. The Court stated that *Strickland* should not be regarded as a major change in sixth amendment jurisprudence because the various available standards produce disparate results "only in the rarest case." *Id.* 466 *U.S.* at 696–97,

104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699 (citing *Trapnell v. United States, supra,* 725 *F.*2d at 153, for the proposition that the "farce and mockery" and "reasonable competence" standards produced uniform results). Further reducing the potential impact of *Strickland* was the Court's repeated insistence that the essence of effective representation is not objectively competent attorney performance, but instead "the fundamental fairness of the proceeding whose result is being challenged." *Id.* 446 *U.S.* at 696, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699. Indeed, the Court stated: "The benchmark for judging ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 692–93.

■ Even if we are not constitutionally compelled to adopt the *Strickland-Cronic* test, the development of the law in this area impels us to conclude that we should recognize the soundness and efficacy of both the substance and formulation of this federal Constitutional standard in defining our own State Constitutional guarantee of effective assistance of counsel. We therefore hold that under Article I, paragraph 10 of the State Constitution a criminal defendant is entitled to the assistance of reasonably competent counsel, and that if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated.

### III.

We turn next to the standards for reversing a conviction under the *Strickland-Cronic* test, as reflecting both the federal and State constitutional rights of effective assistance of counsel. This entails an examination of the rule of prejudicial error in this context. Specifically, we must determine the quality of prejudice that must be shown—in terms of the particular inef-

fectiveness on the part of counsel—in order to warrant reversal.

Both earlier federal and New Jersey cases have noted the incongruity of applying a "harmless error" test to a violation of the constitutional right to counsel. The right to be effectively represented by counsel largely undergirds all other rights of criminal defendants. *See State v. Sugar, supra,* 84 *N.J.* at 16 ("[w]ithout the guiding hand of counsel, an innocent defendant may lose his freedom because he doesn't know how to establish his innocence") (quoting *Powell v. Alabama, supra,* 287 *U.S.* at 69, 53 *S.Ct.* at 64, 77 *L.Ed.*2d at 170). Consequently, both federal and New Jersey cases have sometimes articulated the principle that "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States,* 315 *U.S.* 60, 62 *S.Ct.* 457, 86 *L.Ed.* 680 (1942); *see Williams v. Kaiser,* 323 *U.S.* 471, 475, 65 *S.Ct.* 363, 366, 89 *L.Ed.* 398, 402 (1945); *State v. Ebinger, supra,* 97 *N.J.* at 27.

New Jersey's pre-*Strickland* formulations of "farce and mockery" or "fundamental fairness" do not explicitly require a showing of prejudice. Indeed, *State v. Bentley, supra,* 46 *N.J.Super.* 193, expressly eschews the relevance of prejudice under its due process analysis, holding that counsel's failure to act competently is no ground for reversal "even though such failure results in a conviction which perhaps might have been avoided." *Id.* at 203. To this extent the "farce and mockery"/"fair trial" standard may well be less protective of sixth amendment rights than *Strickland* and *Cronic.* Nevertheless, at least some "farce and mockery"/"fair trial" cases consider whether counsel's failure was prejudicial to defendant's case. *See, e.g., State v. Edge, supra,* 57 *N.J.* at 592–93; *State v. Dennis, supra,* 46 *N.J.* at 478; *State v. Coruzzi, supra,* 189 *N.J.Super.* at 319–21; *State v. Clark,* 105 *N.J.Super.* 381, 384 (App.Div.1968).

In some contexts, our courts have been willing to presume prejudice. This was the case in *Jablonowski v. State, supra,* 171 *N.J.Super.* at 112, in which the Appellate Division refused to indulge in "nice calculations as to whether or not defendant was prejudiced" by having counsel appointed three hours before trial. This approach has generally not been followed in other "ineffectiveness" cases in New Jersey based on inadequate preparation or incompetence.[2]

Although there is an intuitive appeal to the view that "harmless error" tests do not apply to constitutional violations, a conclusive presumption of prejudice every time defense counsel failed to display "reasonable competence" would allow for an intolerable number of truly unnecessary reversals. "Ineffective assistance" appeals have never been favored by courts. *See Strickland, supra,* 466 *U.S.* at 689–90, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 694–95.

■ We are satisfied that unless the case warrants a presumption of prejudice under *Cronic,* a defendant whose counsel performed below a level of reasonable competence must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

---

[2]Only in the contexts of conflicts of interest and denial of access to counsel have the New Jersey courts authoritatively endorsed a presumption of prejudice. In *State v. Bellucci,* 81 *N.J.* 531 (1980), defendant's attorney represented two codefendants until just before they entered guilty pleas, and his law partner represented another codefendant at trial. No waiver was ever obtained from defendant. The Court held that defendant had been denied the effective assistance of counsel and announced the rule that "once a potential conflict exists, prejudice will be *presumed* in the absence of waiver * * * even if associated attorneys are involved instead of the same attorney." *Id.* at 543 (citing *State v. Land,* 73 *N.J.* 24, 35 (1977)); *see also State v. Ebinger,* 97 *N.J.Super.* 23, 27 (App. Div.1967). In addition, when a trial court denied a defendant access to his attorney during an overnight recess, this Court announced a *per se* rule. *State v. Fusco,* 93 *N.J.* 578, 589–90 (1983) (a court imposed restriction on a defendant's right to communicate with counsel during an overnight recess ... constitutes the deprivation of a right so fundamental that it is reversible error and prejudice need not be shown.).

been different." *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. Accordingly, we determine that a conclusive presumption of prejudice is inappropriate except in cases exemplified by egregious shortcomings in the professional performance of counsel.

## V.

We turn finally to whether, based on the facts of this case, defendant is entitled to a reversal of his conviction under the *Strickland-Cronic* test. Defendant contends initially that he is entitled to a presumption of prejudice under *Cronic.*

One aspect of defendant's claim is that counsel's lack of preparation time—resulting from the trial court's refusal to grant a continuance—itself deprived defendant of constitutionally adequate assistance of counsel. However, as *Cronic* and the cases decided after it make clear, the obstacles facing defendant's attorney in terms of inability to prepare are insufficient to warrant a presumption of prejudice and to excuse the need for an inquiry into the actual conduct of the trial.[3] Indeed, no federal court has reversed a criminal conviction, pursu-

---

[3]It has long been settled that the granting of a continuance to enable counsel to prepare for trial is a matter left to the sound discretion of a trial judge, "the exercise of which will ordinarily not be reviewed." *Avery v. Alabama,* 308 *U.S.* 444, 446, 60 *S.Ct.* 321, 322, 84 *L.Ed.* 377, 379 (1940); *see Morris v. Slappy,* 461 *U.S.* 1, 11–12, 103 *S.Ct.* 1610, 1616, 75 *L.Ed.* 2d 610, 620 (1983); *Ungar v. Sarafite,* 376 *U.S.* 575, 589, 84 *S.Ct.* 841, 849, 11 *L.Ed.* 2d 921, 931 (1964). *But see Ungar v. Sarafite, supra,* 376 *U.S.* at 589, 84 *S.Ct.* at 849, 11 *L.Ed.* 2d at 931 ("a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."); *Morris v. Slappy, supra,* 461 *U.S.* at 11–12, 103 *S.Ct.* at 1616–17, 75 *L.Ed.* 2d at 620. *Cronic* and *Strickland* did not significantly alter the treatment of inadequate preparation cases in the lower federal courts. The vast majority of sixth amendment claims based upon inadequate preparation continue to be rejected regardless of whether the inadequate preparation is traceable to the haste of the trial court or the incompetence of the trial attorney. *E.g. Aldrich v. Wainright,* 777 *F.* 2d 630 (11th Cir.1985); *Griffin v. Aiken,* 775 *F.* 2d 1226 (4th Cir.1985); *United States v. Rodgers,* 755 *F.* 2d 533 (7th Cir.1985); *United States ex rel. Smith v. Lane,* 609 *F.Supp.* 656 (D.C.Ill.1985).

ant to *Cronic,* based solely on the ground of inadequate attorney preparation, whether attributable to the trial court's refusal of a continuance or not. *See, e.g., United States v. Mills,* 760 *F.*2d 1116 (11th Cir.1985) (*Cronic* presumption rejected when trial attorney had one day to prepare for narcotics trial but earlier counsel had researched and prepared file); *Praylow v. Martin,* 761 *F.*2d 179 (4th Cir.1985) (no *Cronic* presumption of ineffectiveness when counsel appointed on the same day defendant pled guilty).

Reversals following *Cronic* have arisen only from more significant impairments of adequate representation than usually occur from lack of preparation. *E.g., Martin v. Rose,* 744 *F.*2d 1245 (6th Cir.1984); *see also Walberg v. Israel,* 766 *F.*2d 1071 (7th Cir.), *cert.* den., —— *U.S.* ——, 106 *S.Ct.* 546, 88 *L.Ed.*2d 475 (1985) (*Cronic* presumption appropriate when trial court actively interfered with defense counsel's representation and indicated to counsel that his future appointments to represent indigents would be jeopardized if he pressed too hard during trial; focus on "state interference" with representation); *Siverson v. O'Leary,* 764 *F.*2d 1208 (7th Cir.1985) (*Cronic* presumption appropriate where defense counsel was completely absent during jury deliberations and the return of the verdict, thus missing jury communications, motion for mistrial, and polling jury); *Wilson v. Mintzes,* 761 *F.*2d 275 (6th Cir.1985) (*Cronic* presumption appropriate where trial court questioned counsel's competence, provoked him into acts inconsistent with his duty of client loyalty, and refused to grant client's motion for substitution of counsel); *Blake v. Kemp,* 758 *F.*2d 523 (11th Cir.), *cert.* den., —— *U.S.* ——, 106 *S.Ct.* 374, 88 *L.Ed.*2d 367 (1985) (*Cronic* presumption appropriate where state failed to provide examining psychiatrist with defendant's taped confession and letter written by defendant, both of which strongly supported insanity defense); *Government of Virgin Islands v. Zepp,* 748 *F.*2d 125 (3rd Cir.1984) (*Cronic* presumption appropriate when trial counsel had actual conflict of interest due to (1) his potential liability for same charges on which defendant

was tried and (2) fact that counsel was a prosecution witness); *Green v. Arn*, 615 *F.Supp.* 1231 (N.D. Ohio 1985) (*Cronic* presumption appropriate where defense counsel was absent during the examination of key witness by counsel for codefendant).

We are satisfied from this collective judicial experience that the trial court's denial of defendant's motion for a continuance in this case to enable defense counsel to prepare did not completely vitiate the "crucible of meaningful adversarial testing." *Cronic, supra,* 466 *U.S.* at 656, 104 *S.Ct.* at 2045, 80 *L.Ed.* 2d at 666. The record shows that counsel was familiar with this case prior to trial, having spoken with defendant about a proffered plea bargain. Moreover, counsel had at least one full day, and potentially three full days, to prepare for the trial. Finally, this case did not present overly difficult or complicated issues to an experienced criminal trial attorney. Thus, defendant is not entitled to a presumption of prejudice under *Cronic.*

Since a presumption of prejudice is unwarranted, we must turn to the "actual ineffectiveness" test of *Strickland* to evaluate whether defendant received inadequate assistance of counsel. Defendant argues that counsel's performance was inadequate because he (1) failed to contact witnesses who could have aided in the defense and (2) failed to use Armstrong's probable cause testimony for impeachment purposes. As noted, we must determine whether, as a matter of reasonable probability, the result of the trial would have been different had counsel not performed deficiently in these respects.

Initially, defendant does not deny that his attorney performed as well as could be expected under the circumstances; he asserts instead that the circumstances inexorably resulted in his receiving ineffective assistance. As noted in *Moore v. United States, supra,* 432 *F.* 2d at 739, "[t]he exercise of utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the

case or failed to interview essential witnesses or to arrange for their assistance." Consequently, defense counsel's vigorous representation during trial cannot mitigate the fact that he was allegedly seriously unprepared and, thus, performed inadequately.

With respect to the contention based on absent witnesses, the fact that *defendant* had ample time to identify witnesses and assist in the defense is irrelevant to whether his *counsel* had provided effective assistance. Here, for example, the trial court observed that there had been "plenty of time for [defendant] to do whatever he thought he had to do." However, as we remarked in *Rodriquez v. Rosenblatt*, 58 *N.J.* 281, 295 (1971), if a criminal matter "has any complexities, the untrained defendant is in no position to defend himself.... " *See also State v. Sugar, supra,* 84 *N.J.* at 16 (the burden may not be placed on defendant to represent himself, because "the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty") (quoting *Johnson v. Zerbst, supra,* 304 *U.S.* at 462–63, 58 *S.Ct.* at 1022, 82 *L.Ed.* 1461). Accordingly, we must focus on whether counsel was, in fact, adequately prepared, not on whether with defendant's help he could or should have been.

■ We can dispose of defendant's claim based on absent witnesses fairly easily. These witnesses have never been identified and their potential testimony has never been described. The case law makes clear that such purely speculative deficiencies in representation are insufficient to justify reversal. *See United States v. Rodgers, supra,* 755 *F.* 2d 533, 541 (counsel's failure to interview certain witnesses because of time pressure nonprejudicial when counsel could identify the witnesses but had "made no showing whatsoever that ... the ... witnesses to which he alludes would offer any favorable testimony...."); *Aldrich v. Wainwright, supra,* 777 *F.* 2d at 637 (assertion of prejudice rejected because "[defendant] has not identified any

specific information that would have been revealed by depositions or interrogatories and would have added to the impeachment of the state's witnesses.") Hence, we reject this aspect of defendant's argument because defendant has never identified any witnesses, either before or after the trial, who could have aided his defense. We cannot hold that he was prejudiced by going to trial without them.

The import of the probable cause testimony and the failure to have used it pose a much more difficult problem. Defendant claims that counsel's failure to obtain the hearing transcripts left him unable to impeach the State's main witness, Armstrong.

Our courts have recognized the importance to a defendant's case of impeachment evidence. *See State v. Brown*, 132 *N.J. Super.* 584, 587 (Law Div.1975) ("Defense counsel bears the burden of exposing any bias, prejudice or ulterior motive that affects the reliability of [the State's] testimony. This endeavor is severely hampered if the accused is deprived of information which may form the basis of such an attack."). Unavailability of such evidence has been held sufficient to ground a claim of ineffective assistance of counsel. *See Asbell v. United States*, 436 *A.*2d 804, 807 (D.C.App.1981); *Johnson v. United States*, 413 *A.* 2d 499, 504–05 (D.C.App.1980). However, the significance of the impeachment evidence is frequently difficult to assess. In *State v. Sullivan*, 43 *N.J.* 209 (1964), *cert.* den. 382 *U.S.* 990, 86 *S.Ct.* 564, 15 *L.Ed.* 2d 477 (1966), we upheld a murder conviction despite the fact that prior grand jury testimony had not been available for impeachment. The Court examined this prior testimony and compared it with the trial testimony, and concluded that "in light of the whole case, [the discrepancies] are not so material in character or so prejudicial as to justify a reversal." *Id.* at 240. Moreover, it has been held that the absence of some impeachment evidence is not prejudicial when the credibility of the State's witness has nevertheless been subject to attack. *State v.*

*Terry,* 89 *N.J.Super.* 445, 452 (App.Div.1965); *Aldrich v. Wainwright, supra,* 777 *F.* 2d at 637; *United States ex rel. Ford v. State of New Jersey,* 400 *F.Supp.* 587, 594 (D.N.J.1975).

In resolving this issue, it might also be helpful to analogize it to a case in which a convicted defendant moves for a new trial on the basis of newly discovered evidence. Rule 4:50–1(b) provides that a court may grant such a motion if the newly discovered evidence "would probably alter the judgment." *See State v. Carter,* 91 *N.J.* 86, 121 (1982) (Before a defendant is entitled to a new trial on this ground, he must establish that the new evidence is (1) "material to the issue and *not merely cumulative or impeaching or contradictory"* and (2) "of the sort that would probably change the jury's verdict if a new trial were granted.") (emphasis added).

██ Whether or not defense counsel's failure to use Armstrong's probable cause testimony prejudiced defendant to the extent that there is a reasonable probability that defendant would have escaped conviction is a difficult question to answer from the vantage of an appellate review of the trial record. Armstrong's probable cause testimony materially contradicted significant elements of his testimony at trial. At the probable cause hearing, Armstrong specifically denied that defendant hit him although he did testify that defendant grabbed his gun. Yet, Armstrong asserted at trial that defendant did strike him. Less significant is the discrepancy about whether defendant ever actually pointed the gun at Armstrong. The State argues that cross-examination of Officer Price as to what Special Officer Armstrong did or did not tell him overcame the unavailability of the probable cause testimony. Specifically, defense counsel succeeded in getting Officer Price to admit that Armstrong failed to report that defendant had actually hit him. Thus, Armstrong was in fact subject to impeachment with respect to the critical facts of the case. Defendant counters that this is not as effective for impeachment purposes as confronting Armstrong directly with his own contradictory statements sworn to at the probable cause hearing.

Given the difficulty of this issue, we believe the proper course is to remand it to the trial court for resolution in light of the standard that we adopt today. The *Strickland-Cronic* test provides trial courts with sharper guidelines to use in determining whether or not a defendant has been deprived of constitutionally adequate representation of counsel. The trial court is clearly in the best position to decide whether there is a reasonable probability that had defense counsel been able to cross-examine Armstrong on the basis of his prior testimony adduced at the probable cause hearing, defendant would not have been convicted. Defendant therefore should be given the opportunity to bring or renew a motion for a new trial based on the claim of ineffective assistance of counsel.

### IV.

Accordingly, for the reasons expressed, the judgment of the Appellate Division is modified and the matter is remanded to the trial court for proceedings consistent with this opinion. We do not retain jurisdiction.

*For modification and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.