NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0058-15T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

ALBERTO SALAZAR,

 Defendant-Appellant.

__________________________________

 Submitted September 14, 2017 – Decided October 6, 2017

 Before Judges Alvarez and Nugent.

 On appeal from Superior Court of New Jersey,
 Law Division, Middlesex County, Indictment No.
 01-03-0349.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Carolyn V. Bostic, Designated
 Counsel, on the brief).

 Thomas K. Isenhour, Union County Prosecutor,
 attorney for respondent (Milton S. Leibowitz,
 Assistant Prosecutor, of counsel and on the
 brief).

PER CURIAM

 This case involves defendant's application for post-

conviction relief (PCR) from his felony murder conviction and
sentence. Following our remand for a hearing on defendant's PCR

petition, the trial court conducted a hearing to determine why

defendant's trial counsel had not presented the testimony of a

medical expert. The expert wrote a report questioning whether the

injuries the victim sustained in a fall during the robbery caused

defendant's death. Based on counsel's testimony during the remand

hearing, which the trial court found credible, the court concluded

trial counsel made a strategic decision not to call the expert.

For that reason, the trial court denied defendant's PCR petition.

 Adhering to our standard of review, we accept the trial

court's credibility determinations and consequent finding that

trial counsel's decision not to call the medical expert was

strategic. Such strategic decisions, which are always subject to

second-guessing, are generally not grounds for reversing a

conviction based on the ineffective assistance of trial counsel.

This case presents no exception. Accordingly, we affirm.

 A jury convicted defendant of second-degree reckless

manslaughter, N.J.S.A. 2C:11-4(b)(1), first-degree felony murder,

N.J.S.A. 2C:11-3(a)(3), and second-degree robbery, N.J.S.A. 2C:15-

1. The trial court merged the three convictions and sentenced

defendant on the felony murder count to a thirty-year prison term

without parole. We affirmed his conviction on direct appeal,

State v. Salazar, No. A-6235-03 (App. Div. Feb. 6, 2008), and the

 2 A-0058-15T2
Supreme Court denied defendant's petition for certification, 195

N.J. 523 (2008).

 Four months after the Supreme Court denied defendant's

petition for certification, he filed a PCR petition, which the

trial court denied without an evidentiary hearing. Defendant

appealed. We reversed and remanded for a hearing. State v.

Salazar, No. A-2504-11 (App. Div. May 21, 2014). Following the

hearing on remand, the trial court again denied defendant's PCR

petition. This appeal followed.

 The following facts, which the State established at trial,

provide context for defendant's PCR claim. The victim, age eighty-

eight, lived alone on the third floor of an apartment complex.

One morning, the complex's manager found the victim on her kitchen

floor lying on her back. She had been robbed. The manager called

9-1-1, an ambulance responded, and Emergency Medical Technicians

transported the victim to the hospital, where she died the

following day. On the evening of the robbery, police officers

canvassing the courtyard outside the apartment building found a

plastic bag containing the victim's purse and a black ski mask.

The State stipulated they had tested saliva found on the ski mask

and determined it was inconsistent with defendant's DNA, but was

consistent with that of defendant's son.

 3 A-0058-15T2
 The next night, detectives questioned defendant, who gave

this account of the crime:

 I went back to Miss Feehan's and she was on
 her way walking towards me in the hallway.
 Then she handed me $2 and 25 cents. I came
 down the stairs, went to the store, picked up
 the coffee and bun. I went back into the
 building, got into my apartment and told my
 other daughter to get ready to work and she
 answered me that she was tired and she wasn't
 going to go.

 Then I went to Miss Feehan's apartment
 with the coffee and the bun. I got into the
 apartment. The door wide open like always.
 Miss Feehan was sitting on the couch in the
 living room. I helped her get up from the
 couch, took her to the kitchen, put the coffee
 and the bun on the table and she was standing
 by the table. And I walked back towards the
 living room and I saw the pocketbook. It was
 a chance for me to take the pocketbook which
 I picked up with my right hand. I started
 walking out. By the time I got to the front
 door Miss Feehan saw me and asked me what you
 do. I got scared. I had the pocketbook on
 my left side. I turned around facing her when
 she grabbed my left arm which I was holding
 the pocketbook in. I tried to get her off my
 arm by pulling my arm away from her. Her
 glasses fell off. Then she lost balance and
 fall straight back.

 [Question by Detective]: Did you see her
 hit the floor?

 [Answer by Defendant]: Yes.

 [Question by Detective]: Did you think
 she lost consciousness when she hit the floor?

 [Answer by Defendant]: Yes because she
 didn't make any sounds.

 4 A-0058-15T2
 [Question by Detective]: What did you
 do next?

 [Answer by Defendant]: I left the
 apartment and closed the door after me and
 went straight to my apartment with the
 pocketbook.

 Defendant also admitted that after returning to his

apartment, he placed the victim's purse in a plastic bag, took an

elevator to the basement, opened the back door, and threw the bag

into the backyard. Although acknowledging the ski mask belonged

to his son, defendant denied knowing how it got into the plastic

bag. He admitted using the mask the night before the robbery

while chopping ice, but he claimed he had not worn it since then.

 The State presented three medical witnesses: the victim's

treating physician, an assistant county medical examiner, and a

New York University Professor of Neuropathology. The victim's

treating physician testified that during the two years preceding

her death, the victim was an elderly lady but in good condition.

During cross-examination, the doctor admitted hearing that after

he last saw the victim but before her death, she had fallen and

had been admitted to a nursing home.

 According to the assistant county medical examiner who

performed the autopsy on the victim the day she died, the cause

of the victim's death was blunt force head trauma and the manner

of death was homicide. When performing the autopsy, the doctor

 5 A-0058-15T2
observed "[m]ultiple bruises of the same age, some abrasions and

predominantly . . . on the back of the head, on the top back of

the head was [an] elongated bluish purplish bruise in a measure

one and a half inch by three quarters of an inch." The coloring

was significant because it indicated the bruise was recent, meaning

it had occurred within hours as opposed to days. This and the

other bruises were consistent with a single fall.

 Beneath the bruise on the back of the victim's head was a

subdural hemorrhage, that is, bleeding caused by a broken blood

vessel. The assistant county medical examiner explained that such

a hemorrhage "is going to compress the brain and can produce death

or some neurological anomalies." He further explained, "[i]n this

case there were subdural hemorrhages, that mean[s] blood . . . on

the outside of the brain [on] both sides." The doctor testified

the cause of the victim's death was blunt force trauma to her

head, specifically, to the back of her head. He also explained

the injury to the back of the victim's head caused the bleeding

on both sides of the brain.

 During cross-examination, the assistant county medical

examiner identified a photograph confirming the victim had "small

abrasions" on the top of her head in the front. He conceded the

possibility these bruises were sustained at a different time than

the bruises to the front of her body. Similarly, the doctor

 6 A-0058-15T2
identified abrasions on the victim's back that could have occurred

on the same day but at a different time than bruises on the front

of her body. The doctor testified bruises on the victim's left

chest, left shoulder, back of the arms, and back of the head were

caused by trauma. He reiterated the bruise on the back of the

victim's head was consistent with an impact. The hemorrhages

occurred within minutes to hours of the trauma.

 The State's other medical witness, a New York University

Professor of Neuropathology, examined the victim's brain. He

corroborated the medical examiner's findings and testified there

was no evidence she died from a stroke. He ruled out natural

disease processes as the cause of her death.

 Before defendant's trial started, his attorney obtained a

report from a forensic pathologist. The report included the

following opinion:

 Responsibility for the head trauma which
 led to the stroke that ultimately caused [the
 victim's] death apparently was arbitrarily
 assigned to [defendant]. However, in view of
 the history and physical evidence of repeated
 falls in which [defendant] apparently was not
 involved, it cannot be stated with reasonable
 medical probability that he caused the fall
 that ultimately was responsible for her death.

 Defense counsel did not present the testimony of the forensic

pathologist. Rather, in her summation, she attempted to persuade

the jury defendant's statement confessing the crime was so

 7 A-0058-15T2
inconsistent with the physical evidence that the jury should

disregard it. She further argued the evidence the ski mask

belonged to defendant's son was so strong it suggested he committed

the crime. As noted, the jury rejected this defense.

 Defendant's trial counsel was the only witness to testify at

the remand hearing on defendant's ineffective-assistance claim.

The forensic pathologist from whom she had received a report, Dr.

John E. Adams, had died before the PCR hearing occurred.

 Defendant's trial counsel testified that after receiving Dr.

Adams' report, she compared it with those of the State's medical

experts. Like the State's experts, Dr. Adams concluded the victim

died as a result of head trauma. Trial counsel was questioned

about this statement in Dr. Adams' report: "However, in view of

the history and physical evidence of repeated falls in which

[defendant] apparently was not involved, it cannot be stated with

reasonable medical certainty that he caused the fall that

ultimately was responsible for her death." In response, she said

the statement was not a medical opinion. Counsel explained, "the

idea was that [the victim] could have fallen, she could have fallen

subsequently or before [defendant] pushed her, although there was

no actual physical evidence that that in fact occurred." Trial

counsel asserted that who caused the fall resulting in the victim's

death was a question of fact. In addition, trial counsel testified

 8 A-0058-15T2
she cross-examined the assistant medical examiner and the victim's

treating physician about other falls and other bruises the victim

had sustained.

 During cross-examination at the PCR hearing, trial counsel

explained during her defense theory: defendant was not the person

who committed the crime but confessed to draw attention away from

his son. DNA evidence extracted from the ski mask supported that

theory. Trial counsel testified she and defendant spoke about the

defense. In her opinion, arguing the fall did not cause the

victim's death was inconsistent with the defense theory that

defendant was not present when the crime occurred. As counsel

explained, "I would have basically had to argue [defendant] wasn't

there, he didn't commit this robbery, he didn't commit this push,

however if he did, then . . . the fall didn't cause her death."

Counsel reiterated "there was really no evidence, concrete

evidence in that direction." That is basically what she discussed

with defendant.

 Based on trial counsel's testimony, the trial court

determined it was "counsel's strategic decision not to call Dr.

Adams, the forensic pathologist, as a defense witness." The court

further concluded "that for purposes of the defense, no medical

expert witness testimony was required. Trial counsel's strategy

of cross-examining the State's expert medical witnesses on the

 9 A-0058-15T2
issue of causation achieved the same result of challenging the

witnesses' credibility and creating reasonable doubt as to the

opinions of the State's experts." Acknowledging the defense

medical expert's testimony "would have provided additional support

for the theory that the victim's fall was caused by reasons other

than the defendant's acts," the court nonetheless noted "defense

counsel considered the victim's fall may have been due to her

medical condition and questioned the State's witnesses regarding

same."

 For these reasons, the trial court determined defendant

failed to show his trial counsel's representation fell below an

objective standard of reasonableness, and further failed to show

there was a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have

been different. The trial court thus denied defendant's petition.

 On appeal, defendant argues:

 POINT I

 TRIAL COUNSEL'S DECISION NOT TO CALL DR. ADAMS, WHOSE EXPERT
 TRIAL TESTIMONY WOULD HAVE NEGATED THE CAUSATION ELEMENT OF
 THE FELONY MURDER CHARGE, WAS NOT A SOUND TRIAL STRATEGY, AND
 CONSTITUTED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN
 VIOLATION OF THE DEFENDANT'S RIGHTS UNDER THE 6TH AND 14TH
 AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1,
 PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION.

 A. The Strickland Standard.

 10 A-0058-15T2
 B. None of Trial Counsel's Proffered Reasons Justify Her
 Failure to Call Dr. Adams Whose Report Negated the
 Causation Element of the Felony Murder Charge.

 1. Contrary to Trial Counsel's Testimony, There Were
 Significant Differences Between Dr. Adams' Opinion
 and That of the State's Experts on the Issue of
 Cause of Death.

 2. Trial Counsel Was Mistaken, as a Matter of Law, in
 Concluding That Dr. Adams' Opinion, That
 Responsibility for the Head Trauma Which Caused the
 Victim's Death was "Arbitrarily Assigned" to
 Defendant, Was Not a Medical Opinion.

 3. The Fact That Trial Counsel Cross-Examined the
 State's Witnesses Regarding Their Medical Opinions
 Does Not Excuse Her Failure to Present Her Own
 Medical Expert to Challenge the State's Experts'
 Opinions.

 4. Dr. Adams' Opinion Was Not Only Useful, But Would
 Have Provided Essential Information Necessary For
 the Jury to Find Reasonable Doubt on the Causation
 Element of Felony Murder.

 C. Trial Counsel's Failure to Call Dr. Adams Constituted
 Ineffective Assistance of Counsel Under Strickland.

 To prove ineffective assistance of counsel, a defendant must

satisfy the Strickland two-part test by demonstrating "counsel's

performance was deficient," that is, "that counsel made errors so

serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment"; and, "there is

a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different."

Strickland v. Washington, 466 U.S. 668, 687, 694, 104 S. Ct. 2052,

 11 A-0058-15T2
2064, 2068, 80 L. Ed. 2d 674, 693, 698 (1984); accord, State v.

Fritz, 105 N.J. 42, 58 (1987). Matters falling under the purview

of "trial strategy" do not support a claim of ineffective

assistance of counsel. Fritz, supra, 105 N.J. at 54.

 Here, trial counsel's decision not to call Dr. Adams as a

witness was strategic. To be sure, there is merit to defendant's

contention the doctor's testimony was not inconsistent with the

primary defense theory, namely, defendant's son, not defendant,

perpetrated the crimes. There is also some merit to defendant's

argument that, contrary to trial counsel's assertion, there were

significant differences between Dr. Adams' medical opinion and

that of the State's expert witnesses. Fairly read, the State's

experts were of the opinion that trauma that caused the victim's

death was consistent with a recent impact to her head, which the

jury could only have concluded occurred during the robbery, as

defendant confessed. Dr. Adams' opinion, if believed, would have

undermined the State's expert medical evidence concerning

causation.

 Nonetheless, as trial counsel testified at the PCR hearing,

there was little factual support for Dr. Adams' opinion concerning

causation being inconclusive. And it remains a legitimate strategy

not to water down a stronger theory of defense with a weaker

alternate theory. In this case, the State stipulated the ski mask

 12 A-0058-15T2
found in the bag with the victim's purse belonged to defendant's

son. The State was unable to introduce any forensic evidence

linking the ski mask to defendant. Thus, prospectively, one could

have reasonably decided as a matter of trial strategy that

presenting a tenuous causation theory might cause the jurors to

believe defendant was presenting smokescreens in a weak attempt

to undermine his confession. Such strategy could be viewed as

creating the risk of losing credibility with the jury and eroding

a defense supported by forensic evidence.

 Although there were inconsistencies between trial counsel's

testimony at the PCR hearing and the trial record, those

inconsistencies were explainable in part by the lapse of time –

twelve years – between the trial and trial counsel's testimony at

the PCR hearing. In any event, the trial court found trial

counsel's testimony at the PCR hearing "believable and . . .

credible." The trial court's credibility determination is

supported by sufficient credible evidence on the record, so we

will not disturb it. State v. Gamble, 218 N.J. 412, 424 (2014).

 Having concluded defense counsel made a strategic decision

not to present Dr. Adams as a trial witness, we affirm the trial

court's denial of defendant's PCR petition. Fritz, supra, 105

N.J. at 54.

 Affirmed.

 13 A-0058-15T2