**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5054-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KENNETH PAGLIAROLI,

    Defendant-Appellant.

_____

Submitted March 22, 2017 — Decided July 18, 2017

Before Judges Alvarez and Lisa.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 05-03-0335.

Joseph E. Krakora, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the brief).

Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (Joie Piderit, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Kenneth Pagliaroli appeals from the May 15, 2015 denial of his petition for post-conviction relief (PCR) after an evidentiary hearing. We now affirm.

Defendant was sentenced on June 16, 2006, to an aggregate fifty-year sentence after a month-long jury trial. The convictions and corresponding sentences were broken down as follows: first-degree conspiracy to commit armed robbery, N.J.S.A. 2C:5-2 and 2C:15-1(a)(1), twenty years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and (count three); first-degree conspiracy to commit aggravated manslaughter, N.J.S.A. 2C:5-2 and 2C:11-4(a)(1), thirty years subject to NERA (count three); accomplice to first-degree armed robbery, N.J.S.A. 2C:2-6(b)(3) and 2C:15-1(a)(1), twenty years subject to NERA (count four); accomplice to first-degree aggravated manslaughter, N.J.S.A. 2C:2-6(b)(3) and 2C:11-4(a)(1), thirty years subject to NERA (count five); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), ten years with a parole ineligibility period of five years (count seven).

The sentences for the aggravated manslaughter offenses, although concurrent to each other, were made consecutive to the armed robbery offenses, which were also concurrent to one another. The sentences for the unlawful possession of a weapon offense was concurrent to the robbery offenses.

2

Defendant was acquitted of the charge of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) and 2C:2-6 (count six). The State dismissed counts one, two, and eight, which charged defendant with third-degree conspiracy to commit burglary, N.J.S.A. 2C:5-2 and 2C:18-2, third-degree burglary, N.J.S.A. 2C:18-2, and first-degree conspiracy to commit murder, witness tampering, hindering prosecution, and hindering apprehension, N.J.S.A. 2C:11-3, 2C:28-5(a), 2C:29-3(b)(3), and 2C:5-2.[1]

On direct appeal, defendant's convictions and sentences were affirmed. Pagliaroli, supra, (slip op. at 51-52), cert. denied, 200 N.J. 206 (2009) (Pagliaroli I). On the appeal of defendant's PCR petition, we remanded the matter for an evidentiary hearing on his ineffective assistance of counsel claim. State v. Pagliaroli, No. A-2167-11 (App. Div. July 31, 2014) (Pagliaroli II). The basis of his claim was his attorney's failure to object to the substantial hearsay and bad acts evidence that was introduced at trial, and that his attorney elicited from the State's witnesses on cross-examination.

---

[1] On direct appeal, we noted that although there were no conspiracies beyond the completed offenses, none of the convictions were merged. To date, that issue has not been addressed. State v. Pagliaroli, No. A-6153-05 (App. Div. Apr. 8, 2009) (slip op. at 50).

We discuss the relevant factual scenario in order to provide some context for our discussion regarding the attorney's trial strategy. According to the State's witnesses at trial, defendant, defendant's wife, and the victim had a tumultuous relationship. The victim, Richard Maskevich, known as "Pops," was a sixty-eight-year-old drug dealer. He treated defendant and defendant's wife as his own children. The relationship ran the gamut from loud arguments to jaunts to Atlantic City to gamble. Once, after Maskevich spoke to defendant on the phone, he complained that defendant was trying to get his money, and had threatened to kill, sodomize, and be cruel to him. Maskevich made a practice of keeping substantial amounts of cash in his home, as well as substantial quantities of cocaine.

A State's witness testified at the trial that at one point defendant also sold cocaine. Defendant and his wife over the years had borrowed substantial sums of money from the victim, and at least once, the victim had bailed defendant out of jail.

Maskevich also supplied defendant's wife, a drug addict who struggled with mental health issues, with cocaine and marijuana. By the summer of 2003, defendant was cooperating with the Maine Drug Enforcement Agency (DEA). On one occasion, he took his wife into the office of the agent who was his contact. Defendant asked

the agent to do something to stop Maskevich from supplying her with drugs.

Another State's witnesses testified that Maskevich's house had been repeatedly burglarized. Maskevich suspected the break-ins were committed by someone he knew, either his son-in-law, or defendant. The victim had also spoken to defendant's wife about his belief that defendant had been burglarizing his house. Shortly before the murder, on July 14, 2003, the home was again burglarized. After initially calling police, the victim told them he did not wish to pursue the matter any further.

Defendant and his wife operated a tattoo parlor in Maine and one in New Jersey. Another State's witness, who also operated a tattoo parlor, said that in July or August 2003, defendant's wife told her that defendant had robbed the victim.

Defendant's wife wrote a letter to the victim on defendant's behalf, as he was then illiterate. The letter stated:

> I may have not told you. I won $45,000 in 6/9/03 [sic]. I used it --- a friend of mine to absorb the taxes because of SSI because I'm not supposed to gamble because I will lose my medical. That's where I got the money for the [Corvette]. I feel really f---ed up for you saying I robbed you, your house. Since then I've won more money. Since seeing that you ripped me and my wife's marriage apart and wanted her to revoke my bail for the second time even before your house got robbed, you can go f--k yourself.

. . . .

> If in any shape, form or way you think I did this to you and tried to . . . hurt me and shape, form or way [sic], your drug world and you will come to an end the second [sic]. Go f--k yourself. Not your friend anymore.

On the stand, defendant's wife explained the reference in the letter to Maskevich's world coming to an end, as defendant threatening to turn the victim in to the DEA.

Delphie Patton, known as "Dee," was part of the victim's circle of friends, along with defendant and defendant's wife. Several witnesses testified that defendant, after an argument with his wife, allegedly told Patton that he was going to "take her out [,]" referring to his wife, for the sake of the insurance policy on her life.

After Maskevich's murder, police found a voicemail message that defendant left on the victim's answering machine that stated:

> You know, you keep filling [my wife's] head full of s--t. She told me she's moving to New Jersey. Okay? And she also told me that you're saying I got a thirty five thousand dollar car? 1984 Corvette, salvaged title. Look and see what it's worth. She keeps comin' to my shop flippin' out over this f--kin' girl that you're saying. Delphi Patten [sic] is not a girl. It's a f--kin' guy. Keep interfering with my f--kin' life, you mother--ker. What do you want to do? Bring her there and turn her into a coke whore, like you did the last Cathy? I'll tell you what mother f--ker [sic] You want problems with me, now you got f--kin' problems with me.

> Okay?   Now, let's see what the f--k goes on
> with your life, mother--ker.  Don't f--k with
> me, b---h.

On September 3, 2003, the victim was discovered lying in his bed face-up with two bullet holes in his head.

It was undisputed at trial that the actual shooter was Patton, who when arrested in Kansas, made inculpatory statements to the authorities and others.  He also implicated defendant in the killing.  During the PCR hearing, defense counsel discussed those statements and the fact the State's witnesses had been cautioned to avoid any reference to Patton's statements.  The parties stipulated that on October 31, 2003, after his arrest, Patton was found hanging in a jail cell in Kansas.

Defendant's wife testified that during the early morning hours of September 3, 2003, defendant nudged her awake and told her that Patton had shot the victim.  He was on the phone and whispering, and he asked Patton if he had killed him.  She said she heard defendant say, "shoot him again."  Defendant asked her where the victim kept his marijuana and cocaine, and he relayed the information to Patton.  Later, defendant's wife spoke with Patton and left messages on his cell phone.  Cell phone records introduced by the State showed that on September 3, various calls were exchanged between defendant, his wife, and Patton.

Defendant's trial counsel was a certified criminal attorney[2] and very experienced. He testified at the PCR evidentiary hearing that because of the damning letter and threatening voicemail, he and his client knew the trial was going to be an uphill battle. Trial counsel had previously represented defendant in matters in Maine, where he was also licensed. He and the two seasoned retired

[2] Rule 1:39 provides that "[a]n attorney of the State of New Jersey may be certified as a . . . criminal trial attorney . . . but only on establishing eligibility and satisfying requirements regarding education, experience, knowledge, and skill for each designated area of practice[.]" In addition to meeting the eligibility requirement of being a member in good standing of the New Jersey bar for at least five years:

> a candidate for certification must demonstrate "[e]xtensive and substantial experience" in the designated practice area, as defined in the Board on Attorney Certification's regulations. R. 1:39-2(b). He or she must establish "professional fitness and competence in the designated area of practice" by presenting peer references, supplemented by the Board's or Committee's investigation of the candidate's qualifications and reputation. R. 1:39-2(c). The candidate must demonstrate "satisfactory and substantial educational involvement within the three years immediately preceding his or her application." R. 1:39-2(d). Upon completion of the requirements of Rule 1:39-2, the candidate must pass a written examination in the relevant field. R. 1:39-3.
>
> [In re Hyderally, 208 N.J. 453, 458-59 (2011).]

police officers who acted as investigators in the case developed a strategy, together with defendant. They decided to acknowledge the volatile relationship between defendant, his wife, and the victim, and attempt to place the blame for the killing squarely on defendant's wife, hoping to convince the jury that she was the one who conspired with Patton to commit murder. During the trial, the jury heard the fact defendant's wife was not charged at all in exchange for her testimony.

At the trial, counsel questioned defendant's wife extensively regarding her psychiatric history and psychiatric commitments, in addition to her drug problems. He also brought out before the jury that she had given six different versions to the authorities regarding the murder, including statements in which she denied that her husband had been involved. Trial counsel wanted to recast the threatening letter and the voicemail in a more benign light, as merely defendant's efforts to stop the victim from supplying drugs to his wife.

Trial counsel was asked by defendant's PCR counsel during the course of the lengthy PCR hearing point-by-point regarding specific hearsay or bad acts statements made by various witnesses, and his reason for not objecting. Trial counsel even acknowledged that during the trial, the judge had stated for the record at sidebar that material was being introduced which was potentially

objectionable. But trial counsel declined to object, and the judge allowed him to continue in that fashion, commenting that counsel was following a strategy in doing so.

Trial counsel said it was his firm belief, "to this day, that the verdict that we have was a compromise[] verdict." In other words, that by deliberately allowing the sordid and violent milieu occupied by the victim, defendant, and all the State's witnesses to be depicted in full detail, the jury would find none credible and might acquit defendant. Additionally, he at times used hearsay in order to impeach witnesses.

At the hearing, defendant also testified. The judge found defendant's testimony "to be self-serving, not -- not credible." He disputed that he had been given discovery on a timely basis, claimed that there were discrepancies in the testimony that his attorney should have resolved, and said too much testimony was admitted about Patton, who was dead. Defendant also disputed some circumstances developed during the trial regarding the jailhouse cellmate who also repeated certain inculpatory statements he allegedly made while incarcerated.

Defendant claimed he had difficulty communicating with his attorney, that "things just didn't go the way I wanted them to go at trial[,]" and that he would repeatedly ask his attorney to

object but was told in vulgar terms to be silent. He complained that his attorney did not do what he asked him to do.

In his decision at the close of the PCR hearing, the judge described trial counsel's representation as the "pursui[t] [of] a consciously chosen strategy that resulted in defendant's acquittal of the most serious charges against him. . . . murder and felony murder." The strategy, developed with defendant, highlighted the volatile relationship between the parties, a means of neutralizing the threatening voicemail and threatening letter. The judge also found the attorney "to be a very credible witness. Very forthright."

The judge noted that despite the fact Patton's statements implicating defendant were not presented to the jury, the State presented other inculpatory evidence connecting defendant to Patton. This included phone records, and, significantly, videotapes of a meeting defendant had with Patton at a Pennsylvania casino within a day or two of the murder. The admission of that evidence was unavoidable and consequential. The judge found the defense strategy to make defendant's wife appear to be a "pathological liar," because of her mental health and drug issues, was clearly designed to weaken the effectiveness of her testimony.

By developing the extent to which defendant and the victim were financially intertwined, trial counsel hoped to

counterbalance any financial motive. In fact, he was attempting to convince the jury that defendant had "no motive to kill [] Maskevich, who was basically his patron." The judge concluded defense counsel's deliberate strategy regarding hearsay and bad act evidence did establish that everyone involved, all of the State's witnesses, the victim, and defendant, were part of a drug culture, people who were "on the edge[.]"

On appeal, defendant raises the following points:[3]

> THE PERFORMANCE OF THE DEFENDANT'S TRIAL ATTORNEY WAS CONSTITUTIONALLY DEFICIENT WHERE NOT ONLY DID THE TRIAL ATTORNEY'S FAILURE TO OBJECT RESULT IN THE ADMISSION OF NUMEROUS HEARSAY STATEMENTS WHICH PREJUDICED THE DEFENDANT'S RIGHT TO A FAIR TRIAL, BUT IN CONTRAST TO HIS COMMENTS MADE DURING THE TRIAL, HIS PCR TESTIMONY REVEALED THAT HE DEVISED THE PURPORTED STRATEGY TO USE THE INADMISSIBLE HEARSAY IN HINDSIGHT.

In his uncounseled brief, defendant contends as follows:

> POINT I
> DEFENDANT-PETITIONER KENNETH PAGLIAROLI, CONVICTION WAS SECURED IN VIOLATION OF HIS STATE, AND FEDERAL CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL, PURSUANT TO THE UNITED STATES CONSTITUTION, AMENDMENT VI, AND XIV; AND THE NEW JERSEY

---

[3] In his counseled reply brief, defendant raises the argument that a heightened scrutiny should be employed in reviewing this matter because the defense investigation in the case was less than complete. It is improper to raise new issues in a reply brief. R. 2:6-5. Moreover, defendant had the benefit of two retired police officers who assisted his attorney in investigating the case, and who fully participated in interviewing witnesses in preparation for trial. We will not, therefore, address this point.

A-5054-14T1

CONSTITUTION OF 1947, ART. 1, ¶ 1, AND ART. 1, ¶ 10.

A.
TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO CONDUCT AN ADEQUATE PRETRIAL INVESTIGATION AND MEANINGFUL DEFENSE.

B.
TRIAL COUNSEL FAILED TO CONSULT WITH DEFENDANT.

C.
TRIAL COUNSEL FAILED TO DISCUSS WITH DEFENDANT HIS RIGHT TO TESTIFY.

D.
TRIAL COUNSEL FAILED TO CROSS-EXAMINE IN AN EFFECTIVE MANNER.

E.
DEFENSE COUNSEL'S FAILURE TO OBJECT TO HIGHLY PREJUDICIAL OTHER-CRIME EVIDENCE AND HEARSAY TESTIMONY AND TO MAKE APPROPRIATE OBJECTIONS DURING THE TRIAL PROCEEDINGS DENIED DEFENDANT[] HIS RIGHT TO A FAIR TRIAL.

We limit our discussion to the issues raised in defendant's counseled brief, as we consider the claims in his uncounseled brief to be so lacking in merit as to not warrant discussion in a written opinion. R. 2:11-3(e)(2).

Following an evidentiary hearing, appellate consideration is "necessarily deferential to a PCR court's factual findings based on its review of live witness testimony." State v. Nash, 212 N.J. 518, 540 (2013). So long as the judge's factual findings are supported by sufficient credible evidence in the record, they will

be upheld. Ibid. (citing State v. Harris, 181 N.J. 391, 415 (2004), cert. denied, 545 U.S. 1145, 125 S. Ct. 2973, 162 L. Ed. 2d 898 (2005)). A reviewing court "need not defer to a PCR court's interpretation of the law; a legal conclusion is reviewed de novo." Id. at 540-41 (citing Harris, supra, 181 N.J. at 415-16).

In this context, de novo review requires application of the Strickland standard. The Constitutions of both New Jersey and United States guarantee the accused "the right to the effective assistance of counsel" in criminal proceedings against them. Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674, 692 (1984); State v. Fritz, 105 N.J. 42, 58 (1987) (adopting Strickland's ineffective-assistance standard). Establishing ineffective assistance of counsel requires defendant to satisfy two prongs. State v. O'Neil, 219 N.J. 598, 611 (2014).

A defendant seeking PCR on ineffective assistance of counsel grounds must first demonstrate trial counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, supra, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693; Fritz, supra, 105 N.J. at 52. An attorney's representation is deficient if representation "[falls] below an objective standard of reasonableness." Strickland, supra, 466 U.S. at 688, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693; see Fritz, supra, 105 N.J. at

14

58. Whether counsel's conduct at trial was reasonable, and more specifically, whether counsel employed a reasonable trial strategy, is central to this appeal.

Strickland's second prong requires that a defendant "show that the deficient performance prejudiced the defense." Strickland, supra, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693; Fritz, supra, 105 N.J. at 52. A defendant demonstrates prejudice by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, supra, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698; Fritz, supra, 105 N.J. at 52. A "reasonable probability" means a "probability sufficient to undermine confidence in the outcome" of the proceeding. Strickland, supra, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698; Fritz, supra, 105 N.J. at 52.

We observe first that trial counsel in this case was faced with a strong State's case, including defendant's threatening letter to the victim, voicemail threat shortly before the murder, and the videotaped contact with the actual shooter a day or two after the killing. That evidence was compounded by the testimony of defendant's wife to the effect that the night of the shooting, Patton called her husband and she overheard defendant urging the killer to "shoot him again." A novel strategy had to be developed

in order to weaken these proofs, even if they could not be overcome. That it consisted to a great extent of circumstantial evidence did not make the State's case weaker.

The judge found trial counsel a credible witness, and found defendant incredible. These findings are entitled to deferential review. See Nash, supra, 212 N.J. at 540.

Trial counsel, an experienced defense attorney, supported by two experienced investigators, painted a picture for the jury of a drug-riddled unstable underworld in the hopes of diminishing the effect of all the damning testimony, and of creating confusion and distracting storylines whenever possible. The strategy succeeded: defendant was acquitted of the most serious crimes, namely murder and felony murder.

Counsel developed a distinct and novel strategy, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, supra, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. We "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. As always, "[a]s a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal except in those rare instances where they are of such

16                                                           A-5054-14T1

magnitude as to thwart the fundamental guarantee of [a] fair trial." State v. Castagna, 187 N.J. 293, 314-15 (2006) (internal quotation marks and citation omitted). Counsel made reasonable strategic choices in light of the State's case. Trial counsel's decision to allow hearsay and prior bad acts to be testified about without objection in this somewhat unique scenario falls within the wide range of reasonable professional assistance.

The four examples of objectionable material identified by defendant in his brief are just a part of the framework trial counsel wanted to develop. They fit into trial counsel's strategy. For example, that defendant may have threatened the victim on another occasion, which was testimony given by a witness whose bona fides were questionable, made the threatening phone message and letter appear just a part of the ongoing volatile relationship between the two men, who interacted like father and son at times, and at other times, like sworn enemies. Another example is the testimony regarding whether defendant had previously assaulted his wife, or was angry at her and wanted to "take her out[.]" That testimony is less prejudicial in light of the need to cast doubt on her testimony that the shooter called defendant while at the scene, and that defendant told him to shoot the victim a second time because he was still alive. Counsel needed to attribute some improper motive for her testimony —— whether it was revenge, or

to point the finger of blame away from herself.  When faced with an impossible defense, counsel developed a different script from the one that the State was offering to the jury, to his client's benefit.  We will not second-guess his deliberate decision.  Thus we conclude defendant has failed to meet the <u>Strickland</u> standard.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION