**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1526-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DARRICK HUDSON,

      Defendant-Appellant.

_____

Submitted March 26, 2019 – Decided July 9, 2019

Before Judges Yannotti and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 08-02-0310.

Joseph E. Krakora, Public Defender, attorney for appellant (Monique D. Moyse, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Claudia Joy Demitro, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Darrick Hudson appeals from the denial of his petition for post-conviction relief (PCR) after an evidentiary hearing. We affirm.

## I.

Following the partial denial of his motion to suppress inculpatory statements made to police, defendant pled guilty to first-degree aggravated manslaughter, N.J.S.A. 2C:11–4(a); first-degree robbery, N.J.S.A. 2C:15–1; and third-degree hindering apprehension, N.J.S.A. 2C:29–3(b)(1). The court sentenced defendant in accordance with the plea agreement to twenty-five years in prison on the manslaughter charge, and concurrent ten- and three-year terms on the robbery and hindering apprehension charges. We affirmed defendant's conviction and sentence in an unpublished opinion. State v. Hudson, No. A-2631-12 (App. Div. Mar. 1, 2016). The facts regarding the underlying offenses, and the issues raised on direct appeal, are set forth in our opinion and are briefly recounted here to provide context for our opinion.

## II.

On the evening of March 9, 2007, defendant was a passenger, along with Tyler Hart, Basir Biggins, and Nasir Salaam, in a vehicle driven by Gina McCrossen when the group decided to rob a nearby gas station in Atlantic City. According to defendant, once they arrived at the gas station, he, along with

Biggins and Salaam, exited the vehicle, and defendant and Biggins entered the store. The clerk inside the store was shot several times and died, and Salaam shot and injured a gas station attendant outside the store.

Defendants fled the scene, and on March 10, 2007, defendant was arrested and brought to the Atlantic County Prosecutor's Office (ACPO). After defendant and his mother signed a form waiving his Miranda[1] rights, his mother voluntarily left the interrogation room and defendant began to admit his involvement in the incident. At approximately 2:45 p.m., his mother returned to the interrogation room and stated she was going to hire an attorney. The detectives conducting the interrogation left the room nine minutes later. Defendant and his mother were alone in the interrogation room until 3:24 p.m., when a lieutenant entered and discussed the juvenile charging process and the possibility that defendant would be charged with a crime. The lieutenant and defendant's mother then left the room, but the lieutenant returned shortly thereafter with defendant's mentor. With his mentor present, defendant admitted to his presence at the robbery and killing.

Soon after the March 10, 2007 statement was made, defendant's mother hired defendant's first trial counsel to represent him. At the PCR hearing,

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1526-17T4

defendant's initial trial counsel testified that over the course of his career, he represented hundreds of criminal defendants, tried approximately fifteen felony cases, and was familiar with the ACPO. He also testified that when he first met with defendant's mother and mentor regarding the case, they informed him that defendant was present at the robbery and killing, had a minimal role, and never handled a weapon. Defendant's family also informed counsel that defendant made a statement on March 10, 2007. According to defendant's counsel, defendant's family adamantly expressed "that they wanted [defendant] to do the right thing" and that "the right thing was for him to continue to cooperate."

Defendant's counsel first met with defendant at his waiver hearing in juvenile court, where they briefly discussed juvenile court procedures and "the meeting with the family regarding [defendant's] desire to cooperate . . . ." Thereafter, counsel contacted the ACPO because a detective indicated that they had "some follow-up questions that they wanted to ask" and counsel "wanted to make sure . . . that if [defendant] were to continue to be cooperative, that he would be given credit for that cooperation."

On March 19, 2007, defendant and his counsel met at the ACPO, where they privately discussed the events leading to the March 9, 2007 robbery and

killing. Defendant decided not to make a second statement that day, as his mother and mentor were not present and defendant felt uncomfortable.

On March 20, 2007, defendant and his counsel returned to the ACPO with defendant's mother and mentor so that defendant could provide a second statement. Defendant and counsel met privately for a brief time. Thereafter, defendant provided a second statement with counsel and his mentor in the room, and again waived his <u>Miranda</u> rights. Defendant's March 20, 2007 statement repeated much of what he stated on March 10, 2017, but added that Salaam was involved in the incident.

Defendant's counsel stated that he explained to defendant's mother and mentor on that day that "if [defendant] were to provide truthful information and continue to cooperate, that [his] goal was for [defendant] to be treated as a cooperator and that [he] expect[ed] . . . the [ACPO] would . . . reward[] that with respect to an eventual plea agreement." Counsel stated that his goal was for defendant to be charged with an offense "in the low first-degree range," and hoped for a sentence under fifteen years.

Thereafter, counsel had discussions with the ACPO regarding a plea agreement, but was advised that their investigation was still ongoing and they were waiting for DNA evidence to verify defendant's statement. The case

entered a brief period of quiescence after one of the co-defendant's attorneys transitioned from private defense practice to the ACPO. Due to this conflict, the case was transferred to the Attorney General's office.

After the transfer, defendant's initial counsel began discussions with the Deputy Attorney General (DAG) assigned to the case. The DAG, based on DNA evidence of the victim's blood on Salaam, believed that defendant and Salaam misrepresented who was inside the store and killed the victim. Plea negotiations then deteriorated and the DAG informed defendant's counsel that "he would not consider cooperation . . . [or] credits . . . unless he got what he believed was truthful testimony" from defendant. Defendant, however, maintained that his original statements were truthful.

The Attorney General's first plea offer was for thirty years, which defendant's counsel thought was very high. Upset with the term of that offer, defendant's family fired his first attorney, who filed a motion to be relieved as counsel, and was discharged. Defendant was then represented by a public defender for a year, then by a third trial counsel.

Defendant's third trial counsel sought to suppress defendant's March 10, 2007 and March 20, 2007 statements. After an evidentiary hearing, the court issued an order and opinion on July 29, 2011, which suppressed that portion of

6

defendant's March 10, 2007 statements after 2:45 p.m.  The court concluded that defendant's statements on March 10, 2007, before 2:45 p.m., and on March 20, 2007, were admissible because defendant made knowing, intelligent, and voluntary waivers.  The court specifically noted that defendant's initial attorney and his mentor were present for the March 20, 2007 statement.

Thereafter, defendant underwent a psychological evaluation, and submitted a November 30, 2011 psychological report in support of a motion for reconsideration of the July 29, 2011 order.  After considering the parties' submissions, the court entered a June 5, 2012 order denying defendant's motion as to the March 20, 2007 statement because it "was made in the presence of his attorney, [and mentor] and with the benefit of legal counsel."  With respect to the March 10, 2007 statement, however, the court granted defendant's motion and ordered the statement suppressed in its entirety because "[d]efendant did not have the benefit of counsel on that date" and in light of "[d]efendant's limited IQ and reading comprehension abilities . . . [his] waiver of rights" was not knowing, intelligent, and voluntary.  Defendant pled guilty shortly thereafter.

On May 2, 2016, defendant filed a pro se PCR petition, alleging "[i]neffective assistance of counsel" and a "[v]iolation of [his] right to counsel and right to silence."  On January 17, 2017, defendant's PCR counsel filed a

supporting brief, a transcript of defendant's March 20, 2007 statement, certifications of defendant's mother and mentor, the November 30, 2011 psychological report, and an amended verified petition for PCR. PCR counsel filed an additional letter brief on or about January 31, 2017.

Salaam also filed a PCR petition raising similar issues, specifically that his counsel's advice to make a statement to law enforcement officers without first obtaining a plea offer, and without ascertaining all of the relevant facts, constituted ineffective assistance of counsel. State v. Salaam, No. A-3989-14 (App. Div. Jan. 31, 2017) (slip op. at 7). We reversed the denial of Salaam's PCR petition and remanded the case for an evidentiary hearing "for credibility determinations as to what was explained to [Salaam] regarding what he would receive in return for giving a statement" to police. Id. at 13. Because defendant's and Salaam's petitions raised similar issues, the court conducted a single evidentiary hearing addressing both cases on June 22, 2017 and June 29, 2017. The court heard testimony from ten witnesses, including defendant, his mother, his mentor, and his first and third trial counsel.

After hearing extensive oral arguments, the court issued an October 16, 2017 order, denying defendant's PCR petition. In an accompanying written opinion, the court found that defendant's initial trial counsel was a "highly

experienced criminal defense attorney," and characterized his "testimony [as] reliable, complete and entirely credible" and "demeanor on the stand [as] candid and frank." The court stated that counsel "testified that his decisions and other actions in this case were based on his experience with the ACPO in other cases" and that "his past experiences informed his decision-making in this case." The court also found defendant's third attorney was "reliable and credible," and made similar findings with respect to Jill Horenberger, the ACPO's former Chief Assistant Prosecutor.

The court made specific, adverse credibility findings regarding defendant's mother and mentor. The court characterized both witnesses' testimony to be "incredible." The court found defendant's mother to have a "very strong motive" or "bias" to assist defendant, and "gave testimony which was inconsistent with her earlier testimony at a suppression hearing and acknowledged that her memory would have been better in 2011."

As to defendant's mentor, the court observed that his testimony "lack[ed] consistency" and his demeanor "was guarded." The court made similar adverse credibility findings regarding defendant, noting that he was evasive, his testimony "appeared rehearsed," and his version of events, including that his counsel promised a ten-year plea offer, "lacked credibility."

With respect to counsel's decision to permit defendant to provide the March 20, 2007 statement, the PCR court made the following factual findings:

> [defendant's trial counsel] advised that [defendant] should give another statement to ensure that he would be given credit for the first statement and to separate him from the more culpable co-defendants. [Defendant's counsel's] strategy was geared to avoid felony murder charges against his client. [He] reasoned, based on his prior experience working with the ACPO, that getting his client's truthful and accurate version of events before the prosecution completed the investigation would be beneficial to his client and would position him for a favorable resolution. [Defendant's trial counsel] did not have discussions with the ACPO about a specific plea deal, but he wanted to put his client in the best position in order to have him be offered a fair sentence at a later date. This approach, in [his] view, was the best way to position his client under the circumstances.

The court also noted that defendant's counsel's "testimony about his strategy was corroborated by the testimony of . . . Salaam's trial counsel."

The court also found that defendant's first counsel "told [defendant's] family that if he provided truthful testimony he felt comfortable that he would be treated differently than more culpable co-defendants." The court rejected defendant's claim that his counsel promised him a specific plea deal. Rather, the court concluded based on the testimony of defendant's first trial counsel and Horenberger that "[defendant's counsel] spoke with [defendant] and his family

about potential plea deals in hypothetical terms, but did not tell the family that [defendant] would definitively get a certain amount of years if he gave the second statement to police."

Thus, the court concluded that defendant's first counsel "presented [defendant] for a statement after consulting with his client and his family and reviewing the available facts and circumstances." The court found that defendant "failed to meet his burden to show that either [his first or third counsel were] deficient in their respective performance . . . ." Finally, the court determined that defendant's March 20, 2007 statement enabled counsel to negotiate a plea for aggravated manslaughter as opposed to felony murder, with "much lower penal exposure." The court therefore concluded that counsel's "strategy choices appeared to have some success" and defendant "was not prejudiced by his statement." This appeal followed.

III.

Defendant raises the following issues on appeal, which we have renumbered for ease of reference:

> POINT I
>
> DARRICK HUDSON IS ENTITLED TO RELIEF ON HIS CLAIM THAT HIS ATTORNEY RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY PRODUCING HIM TO THE STATE TO GIVE AN

11

INCRIMINATING STATEMENT, THUS ASSISTING THE STATE IN SECURING HIS CONVICTION.

POINT II

DARRICK IS ENTITLED TO RELIEF UNDER UNITED STATES v. CRONIC, 466 U.S. 648 (1984), BECAUSE COUNSEL FAILED TO SUBJECT THE STATE'S CASE TO MEANINGFUL ADVERSARIAL TESTING.

POINT III

DARRICK HUDSON IS ENTITLED TO RELIEF UNDER STRICKLAND v. WASHINGTON, 466 U.S. 668 (1984) AND STATE v. FRITZ, 105 N.J. 42 (1987).

POINT IV

COUNSEL'S PERFORMANCE WAS DEFICIENT.

POINT V

DARRICK SUFFERED PREJUDICE AS A RESULT OF COUNSEL'S DEFICIENT PERFORMANCE.

POINT VI

THE PCR COURT'S FINDINGS ARE UNSUPPORTABLE AND MUST BE REVERSED.

We conclude these arguments all lack merit, substantially for the reasons stated in Judge Bernard E. DeLury, Jr.'s cogent written opinion accompanying his October 16, 2017 order. We amplify the judge's analysis as to the two primary arguments that defendant makes against his first trial attorney: (1) that

12

his counsel's performance was constitutionally ineffective under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and <u>State v. Fritz</u>, 105 N.J. 42 (1987); and (2) that his attorney failed to subject the State's proofs to the "crucible of meaningful adversarial testing," contrary to <u>United States v. Cronic</u>, 466 U.S. 648 (1984).

IV.

Because defendant's PCR petition is predicated on his claim that trial counsel was ineffective, he must satisfy the two-part test pronounced in <u>Strickland</u> by demonstrating that "counsel's performance was deficient," that is, "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687; <u>see also</u> <u>Fritz</u>, 105 N.J. at 58. The first prong requires a showing that "counsel's representation fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688. It is the defendant's burden to prove, by a preponderance of the evidence, that counsel's decisions about trial strategy were not within the broad spectrum of competent legal representation. <u>Fritz</u>, 105 N.J. at 52.

Under the second prong, a defendant must demonstrate that his counsel's errors prejudiced the defense to the extent that the defendant was deprived of a fair and reliable trial outcome. <u>Strickland</u>, 466 U.S. at 687. To prove this

A-1526-17T4

element, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Here, defendant fails to satisfy either prong of the Strickland/Fritz test. Defendant maintains his first counsel's performance was constitutionally deficient, for four reasons. First, he claims that counsel was ineffective by failing to make a reasonable investigation into the facts before deciding to have him confess. Second, defendant contends his counsel was constitutionally deficient by "fail[ing] to file a motion to suppress [defendant's] first confession, or even consider its constitutionality, before securing [defendant's] second confession." Third, defendant maintains his initial trial counsel's performance was ineffective because counsel "failed to ensure that there was any consideration for his client's confession." Fourth, defendant claims his counsel "misadvised [him] about confessing, leading him to believe that he would receive a low term of imprisonment in exchange for his confession, as he was the least culpable defendant." We are not persuaded by these arguments.

The testimony at the PCR hearing revealed that before having defendant cooperate, counsel reviewed the State's discovery, spoke with defendant and his family about the State's evidence, and provided defendant with strategic advice

A-1526-17T4

that he should cooperate in order to secure a favorable plea deal. The PCR court found that defendant's counsel based this strategic decision on his prior experience with the ACPO in other cases. According to the PCR court, given the "overwhelming evidence against" defendant, "this approach, in [counsel's] view, was the best way to position his client under the circumstances," and was a "sound strategic choice . . . ."

Although defendant argues that the fact that the March 10, 2007 statement was ultimately suppressed is evidence of his initial counsel's deficient performance, "courts are required to make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" See State v. Fisher, 156 N.J. 494, 500 (1998) (quoting Strickland, 466 U.S. at 689). As Judge DeLury found, "[e]ven in the early stages" of the investigation, "the proofs against the [defendant] were overwhelming as the co-defendants had all incriminated the [defendant] as being a participant" in the robbery and homicide. Judge DeLury also found counsel was "[a]n experienced criminal defense attorney in Atlantic County" who "knew this was a case where the evidence was overwhelming and the best strategy was to have his client cooperate with law enforcement in an effort to position himself for a favorable

plea agreement." These findings are supported by counsel's testimony at the PCR hearing, which Judge DeLury found was credible.

Thus, prior to advising defendant about making another statement, his initial trial counsel knew that prosecuting authorities had substantial evidence independent of defendant's March 10, 2007 statements to establish defendant's participation in the robbery and homicide. As we explained in deciding defendant's direct appeal, "Biggins was prepared to testify against defendant had he gone to trial, and both Hart and McCrosson had identified defendant and his co-defendants as participants before defendant confessed." Hudson, slip op. at 26. We agree with Judge DeLury's conclusion that "it would not have been sound trial strategy to argue that the [defendant] was not at the scene of the murder nor that he was uninvolved." In light of the substantial independent evidence implicating defendant in the robbery and homicide, counsel's decision to act on his "fear" that defendant "wasn't going to be credited" for his initial statement by advising him to provide another truthful statement before the investigation concluded was not constitutionally deficient assistance of counsel.

We also reject defendant's claim that counsel's decision for defendant to make the March 20, 2007 statement without a plea agreement constituted ineffective assistance of counsel. As the PCR court stated, that decision was a

A-1526-17T4

reasonable "strategic decision" based on counsel's prior experience and the policy of the ACPO not to make early plea promises prior to a completed investigation. The PCR court credited defendant's initial trial counsel's testimony that he previously negotiated with law enforcement officials, without a proffer letter or plea agreement, and obtained favorable results for his clients. Horenberger corroborated the reasonableness of counsel's strategy when she stated that "cooperation would assist in receiving a favorable plea offer at a later time" and that "many experienced attorneys brought their clients in to give statements without a plea offer."

In addition, the PCR court specifically rejected defendant's claim that his initial trial counsel proposed a specific plea deal. Rather, the court found that counsel discussed plea deals in hypothetical terms, and the record developed at the PCR hearing supports that determination.

Finally, even assuming counsel's approach was constitutionally deficient performance, we agree with Judge DeLury that defendant failed to establish that he was prejudiced under the Strickland/Fritz test. In this regard, the PCR court concluded that counsel's "strategy choices appeared to have some success" as the March 20, 2007 statement permitted defendant's third counsel to negotiate a

plea agreement down from the felony-murder charge to aggravated manslaughter, which carried "much lower penal exposure."

V.

Defendant also argues that "producing [defendant] to the [S]tate to give an incriminating statement, thus not only failing to subject the prosecutor's case to meaningful adversarial testing, but also actually assisting the [S]tate in securing a conviction against [defendant], amounted to ineffective assistance of counsel," and that the presumption of prejudice discussed in Cronic applies here. According to defendant, "[t]hat counsel did not even consider the suppression of a confession from his sixteen year old, intellectually disabled client with no [criminal] record is unconscionable." Therefore, defendant contends, "[c]ounsel wholly abandoned his adversarial role and failed to challenge the [S]tate's case, depriving [defendant] of his right to counsel."

In Cronic, the Supreme Court held that when counsel's errors are of such a magnitude that "no amount of showing of want of prejudice would cure it," it is unnecessary for a defendant to demonstrate prejudice. 466 U.S. at 659 (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)). Cronic has only been applied in the most extreme of cases, such as where trial counsel was completely absent during jury deliberations and the return of the verdict, and where the trial

court openly questioned trial counsel's competence and provoked trial counsel into acts inconsistent with his duty of client loyalty.  See Fritz, 105 N.J. at 62–63; see also Siverson v. O'Leary, 764 F.2d 1208 (7th Cir. 1985); Wilson v. Mintzes, 761 F.2d 275 (6th Cir. 1985).  "Failure to file a suppression motion, however, is not one of those circumstances."  State v. Goodwin, 173 N.J. 583, 597 (2002) (quoting Fisher, 156 N.J. at 501).

The alleged deficiencies in counsel's decision to advise defendant about providing a second inculpatory statement fall far short of those described in Cronic and its progeny.  As we explained in defendant's direct appeal, "[g]iven the fact that a co-defendant already decided to cooperate and testify against defendant," advising defendant to "provid[e] a second statement to police in an effort to facilitate a plea deal. . . . was not an unreasonable strategy."  See Hudson, slip op. at 19-20.  Therefore, no prejudice can be presumed from trial counsel's decision to advise defendant to make the March 20, 2007 statement.  Judge DeLury correctly decided that defendant was not entitled to post-conviction relief on this basis.

In addition, as previously discussed, counsel's representation did not reflect a "complete failure" such that the State's case was not tested against "the crucible of meaningful adversarial testing" warranting the Cronic presumption.

See Cronic, 466 U.S. at 656, 659. Just as advice that a client should plead guilty can constitute advice that "falls within the range of reasonable competence under the circumstances," see id. at 656 n.19, Judge DeLury correctly concluded that advising defendant to provide a second statement was reasonable in light of the overwhelming evidence implicating defendant in the robbery and killing. We therefore conclude that there was no "breakdown in the adversarial process that would justify a presumption that [defendant's] conviction was insufficiently reliable to satisfy the Constitution." See Cronic, 466 U.S. at 662.

To the extent we have not specifically addressed any of defendant's remaining contentions, it is because we find they have insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION