**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0268-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

STEVEN W. TURNER,

    Defendant-Appellant.

_____

Submitted December 2, 2020 – Decided February 22, 2021

Before Judges Alvarez and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 13-10-1391.

Law Offices of Jef Henninger, attorneys for appellant (Jef Henninger, on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent (Ryan William Sundstrom, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Steven W. Turner appeals the August 23, 2019 denial of his petition for post-conviction relief (PCR) based on claims of ineffective assistance of counsel. We now reverse and remand, finding defendant established facts constituting a prima facie case, thereby requiring an evidentiary hearing. See R. 3:22-10(b).

As set forth in our unpublished opinion affirming the conviction on direct appeal, on April 29, 2016, defendant was convicted of third-degree failure to pay taxes with intent to evade, N.J.S.A. 54:52-9. State v. Turner, No. A-5279-15 (App. Div. Apr. 23, 2018).

Defendant worked for United Parcel Service (UPS) for over thirty years prior to his retirement as comptroller. He testified that, beginning in 1978, he acquired stock, against which he would routinely borrow. In 2007, when the stock market began to experience a downturn, his shares began to drop below the loan-to-value ratio, which triggered a margin call. Consequently, he was forced to liquidate his portfolio, amassing capital gains of $1.8 million.

The State displayed defendant's tax returns either on a video screen or an overhead while he explained, "at the end of [2008], there was no stock and there were no loans and a huge capital gain because I had accumulated that stock since 1978." Defendant went on to explain that a margin call is when you are forced

A-0268-19

to sell stock to pay a loan collateralized by that stock when the stock price dips below a certain threshold and threatens your ability to cover the full value of the outstanding obligation. He further testified that at that point he also owed approximately four years' worth of alimony, or $400,000, and $176,331 in 2008 state taxes.

The following year, he filed "married, filing separately," despite having previously filed jointly with his new wife. When they married in 2002, they entered into a prenuptial agreement calling for each to continue to own their individual premarital assets. Defendant's wife owned the home in which they lived.

The Division of Taxation obtained a $72,265.83 judgment against defendant's wife's home for the 2007 tax debt triggered by his stock activities, based on their "married, filing jointly" return for the year. Defendant satisfied that judgment.

At trial, defendant acknowledged the $176,331 debt but said he lacked the means to pay. He further acknowledged that his wife's New Jersey home was valuable and had been sold, netting her a substantial profit. The parties then relocated to Pennsylvania, eventually living in another home his wife purchased

A-0268-19

in her name only. Defendant also discussed the various businesses he had unsuccessfully attempted to start after his retirement in order to earn income.

During defendant's cross-examination, he was repeatedly pressed about the absence of documents corroborating his testimony. We set forth the relevant portions:

> Q    So you tell the story about the margin call, et cetera.
>
> A    Yes.
>
> Q    Let's look at this line, Line 14.
>
> A    Yes.
>
> Q    Bring it up. $363,000 in salary. And you paid nothing in tax on that, right?
>
> A    Correct so far.
>
> Q    So far?
>
> A    I mean -- I'm sorry.
>
> Q    So you didn't withhold anything, right?
>
> A    There was --
>
> Q    Yes?
>
> A    There was --
>
> Q    Sir, simple question.

A    No.

Q    You didn't -- you got the money, right, $363,000, right?

A    Not all of it because it's a gross number and federal taxes are withdrawn from the number. I earned it.

Q    So your federal withholdings were made?

A    Yes. And it was a supplemental payment so it was probably about --

Q    Did you get a tax refund from the federal government that year?

A    I don't think so, no, I don't.

Q    Well, you don't have the -- where are your documents to prove that one way or the other?

A    Well, I didn't get a tax refund because the previous year I had to pay.

Q    Okay. So there's a withholding from the federal government. And there was no withholding made to the State?

A    That's correct.

. . . .

Q    This margin call -- these margin calls, do you have any documents with you today that support this?

A    Not with me, but --

5

Q     Well, you knew you were going to trial today, right, sir?

A     Yes, sir.

Q     And you knew that this is serious, right?

A     Yes.

Q     And you knew that what -- you knew exactly what the State was going to put up, right? You had received all the discovery in this case from the State, right? Yes?

A     I didn't know everything you'd put up.

Q     Every document that's been provided and placed in front of this jury was provided to you and your counsel, right?

A     I suppose. Well, I say it because -- yes, I'm not trying to evade the question.

        . . . .

Q     Well, we're talking about 2008, but we're also talking about in 2008, you conceded that you received $300,000 in-your-pocket money.

A     Yes. And --

Q     And during --

A     Sorry.

Q     And in 2008, $300,000 in your pocket.

A     Right.

A-0268-19

Q      And you used that and spent it in your life, right?

A      I used it to pay the property -- the federal taxes required from 2007 off the 1.2 million that I also had the margin call on.  Same situation that I explained for 2008, there was a segment in 2007, so my 2008 income paid the federal responsibility for 2007.

Q      Where is any documents to back what -- back up what you're saying?  Where are the documents to back them up?

A      (No audible response).

Q      You said that you came -- you knew you were coming to trial today, right, sir?

A      Yes, sir.

Q      And you said that you have these documents, right?

A      (No audible response).

Q      Where are they?

A      Well, when I paid my federal taxes in 2007, I -- when I filed my return, I paid my taxes.  And it was a significant amount due as a result of the fact that I had to do the margin call routine in 2007.

Q      Mr. Turner, you have provided no documents to this jury to back up anything that you have just said, correct?

A      Well, that is correct.

7

A-0268-19

Q     And you knew you were coming to trial today, correct?

A     Yes.

Q     And you didn't even bring those documents to this jury can see whether anything that you're saying makes any sense.

A     That's correct.  I don't have them with me.

. . . .

A     -- I followed -- I just followed the path of the documentation that I received.

Q     Sir –

A     Including the information with Mr. Thomas.  Is he part of his group?

Q     No.

A     Okay.

Q     Do you have any documentation from Mr. Thomas?

A     Yes, I do.  Not with me though.

Q     Okay.  How about the other person that you mentioned, do you have any documentation from him?

A     Not with me.

Q     Okay.  In that letter, you provide no formal proposal to the Division of Taxation to pay your tax?

8

A     That's correct.  It is an approach to arrive at a solution so that I could pay the entire tax.

. . . .

Q     That's [defendant's wife's] tax return, right?

A     Yes it is.

Q     It says she has total gross income of $1,200, correct?

A     That's correct.

Q     So if the taxes were $23,000 a year, $1,200 is not enough to pay the taxes, wouldn't you agree?

A     That's correct.  But she also gets a distribution from her settlement from her divorce that comes through a life insurance policy which is not taxable.

Q     You have any documents supporting that, sir?

A     Not with me.

Q     So just so we're clear, you specifically decided to file your tax return differently in 2008 so that you protected the marital home from being able to be attached to satisfy the tax?

A     Yes, I did.  And we filed separately thereafter, more driven by the fact that we should have filed separately to begin with because we were dealing with two sets assets that came into the marriage and we should have done it from Day 1 to be honest with you.

9

A-0268-19

Q      But you would have owed more tax if you did that.

A      That doesn't matter.  The fact is, it was --

. . . .

A      But that wasn't the driving factor behind it.

Q      No, the driving factor was that you were trying to protect the marital home.

A      I was.

Q      From the New Jersey taxes.

A      Not really.  Well, we weren't planning on moving to start with.  In 2008, we weren't moving anywhere.  I did it to protect -- to honor the marital agreement so that our assets would be kept separate.  And that's why we've filed separate ever since.

Q      Because there were judgments attached to that property, right?

A      I didn't know that.  Honestly, I didn't know it.  I didn't see the documents and the taxes were paid.  So I'm not saying they weren't there, I just never saw it.  Seriously.

. . . .

Q      Sir, your testimony is that UPS started dropping in its value -- the stock started dropping in its value in 2007, correct, that's your testimony?

A      Yes.

10

Q     You have no evidence of that, right?

A     (No audible response).

Q     So if we were to do a look up on the value of the UPS stock in 2007 and see that it didn't fall in 2007, that would be -- that would undermine what you just said, wouldn't it?

A     Yes.  I don't think you'll find that to be the case or I would not have been in the margin call scenario.

Q     Well, you -- we have nothing here saying that you were in a margin call situation, do we?

A     The brokerage reports --

Q     They're not here.

A     They're not here, but they have been reviewed in the past.  And since I haven't heard a single thing about that issue since 2014, I believe that it was accepted that that -- that what I was saying was true because it hasn't been part of any [of] our conversations since I started walking this courtroom.  I mean that's just me -- that's an assumption on my part.

          . . . .

Q     But you're living in a $500,000 house, right?

A     But my mother -- my mother, sorry.  It's my wife's house.  She's working full time and she is supplying all of our living expenses right now to her pain actually.  But she is the one that's supporting my family.  I am surviving enough to keep my credit cards paid and frantically working to get the rest done so that

11

A-0268-19

she no longer carries that burden.  She bought the house with her money.  It's her mortgage.  She pays it.  And everything that we've done in the last two years has been through her.  It's been very difficult.  And I'm still working on this solution so that everybody -- so that the State can be paid fully, 100 percent, interest, everything because I'm an honest person and I want to do it correctly.

    Q   <u>And yet, you didn't bring any of the documents that you claim support everything that you said.  You didn't bring one of those documents to put before this jury so that they could review and corroborate what you just said, right</u>?

    A   That's correct.  And I --

[(emphasis added).]

In closing, trial counsel only touched upon the lack of documentation developed during cross-examination to make the point that the State bears the burden of proof.  The prosecutor attacked defendant's credibility because of the lack of documentation—corroboration—of his statements:

    Thank you, Your Honor.  Good afternoon, ladies and gentlemen.  First of all, I'd like to apologize to you.  I raised my voice when I talked to my colleague Mr. Turner.  I didn't mean to do that.  But sometimes when you hear things from the witness stand, it evokes reaction.  The reaction, it's an interesting reaction.  I think maybe you might have caught it.  Mr. Turner got up here and told you a whole bunch of things.

    And His Honor's going to instruct you that with regard to credibility, one of the things that you have to

12

consider is corroboration. The burden is not being shifted from the State. The State has the burden of proof in this case and we welcome that. Our constitution demands it and it's our job to give you evidence that supports a finding of guilt in this case.

But when you hear testimony and you have one witness who provides document after document after document and can back up everything that he says with documents, you have another witness who is on trial for a serious offense and says, oh, I don't have anything. I didn't think I would need it, you can weigh that in determining the credibility of each of those witnesses. And that's your job as jurors, to weigh the credibility.

There was something very telling about what Mr. Turner said in his testimony. He said, oh, my wife could cover the taxes for the property of 9 Runyan Place. Remember that? And I showed him her 2008 tax return that she only had $1,200 of reported income. He said, oh, no, no, no, there's some non-taxable funds that would support paying the taxes. Right? Remember that he made a big to-do about that?

One thing you might have caught, he said well, we had to sell the house because we couldn't pay the taxes. Really? First he says, oh, no, it wasn't -- I didn't need to separate the house from my wife because she could cover the taxes herself to oh no, we had to sell the house for taxes, and oh, we weren't paying the taxes. Which is it? That's a tell. That's a tell that somebody is not being straight with you about what's really going on.

And let's take a step back. Mr. Turner gets in front of you and he tells you that oh, I had $3 million in loans out. $3 million in loans, that's a lot of money. It's a lot of money. He doesn't give you any explanation.

A-0268-19

He says it's for his [kids'] college. Okay, for those of you who have kids in college, you realize that that could be a lot of money. $3 million, it's not. That money had to have been used for something during the marriage.

And now when the piper comes to call, assuming he's telling you -- because we have no corroboration of what he's telling you. Nothing.

We noted in our earlier decision that defendant claimed his attorney did not ask him for documents verifying his anticipated testimony, nor prepare him for cross-examination. Turner, slip op. at 12. Indeed, over the eight and one-half hours billed by trial counsel, only one hour and forty minutes were spent outside the courtroom in trial preparation. Ibid. Acknowledging that defendant had raised a "colorable claim," we nonetheless deferred addressing the issue of ineffective assistance of counsel to a petition for post-conviction relief (PCR). Ibid. We did so for the obvious reason—in order to afford defense counsel the opportunity to explain her strategy, and to ensure that defendant actually had the documentary evidence available to support his statements. Ibid. Certainly, defendant's production of documents to corroborate his statements, and perhaps even the testimony of other witnesses, such as a financial expert, would have aided the jury in its factfinding function. The thrust of the relevant section of our prior opinion was that the prosecutor effectively challenged defendant's

credibility—a technique that may have been less so if defendant had paperwork to back up what he said. Id. at 12-13.

The judge denied defendant's PCR petition because, despite the fact he was only billed for an hour and forty minutes of trial preparation, the standard was not the length of time spent in trial preparation, but the development of trial strategy and exercise of reasonable professional judgment. Additionally, the trial judge had asked defendant if he intended to testify and felt prepared, to which he responded in the affirmative.

Furthermore, the court did not consider the failure to produce any documents to corroborate defendant's testimony to have affected the outcome. Since there was no dispute that defendant owed the taxes, failed to pay them, and changed his filing status from married filing jointly to married filing separately, he considered the State's proofs to be overwhelming. He further concluded it was not error for counsel to have failed to call an expert with regard to defendant's tax status, as the State did not dispute the tax consequences of the status change, but "the intention of [defendant] by filing in that manner."

Now on appeal, defendant contends the court erred in failing to grant an evidentiary hearing as follows:

15

POINT I

DEFENDANT RECEIVED INEFFECTIVE ASSITANCE [sic] OF COUNSEL AND AS A RESULT DEFENDANT'S RIGHTS WERE PREJUDICED UNDER THE STRICKLAND V. WASHINGTON TEST AND THE TRIAL COURT ERRED IN NOT GRANTING AN EVIDENTIARY HEARING INTO THE MATTER.

a.    Trial counsel failed to adequately consult with Petitioner prior to trial and failed to inquire about documents which Petitioner had in his possession which supported his claims.

b.    Trial counsel was ineffective by failing to obtain an expert in taxation to support his change in tax filing status.

c.    Trial counsel was ineffective for failing to adequately consult with Petitioner regarding his potential testimony at trial and for failing to adequately prepare him for said testimony.

I.

We apply the familiar two-prong Strickland test, adopted in State v. Fritz. Strickland v. Washington, 466 U.S. 668, 685 (1984); State v. Fritz, 105 N.J. 42, 58 (1987). The first question is whether counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. We presume that trial counsel acted reasonably and evaluate counsel's performance without the benefit of hindsight. State v. Pierre, 223 N.J. 560, 579 (2015). Next, we ask

16

whether the alleged ineffectiveness would have "materially affected the jury's verdict." State v. Marshall, 148 N.J. 89, 234-35 (1997). In order to satisfy the Strickland second prong, a "convicted defendant 'must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Pierre, 223 N.J. at 583 (quoting Strickland, 466 U.S. at 694).

We view the evidence in the light most favorable to defendant when deciding whether he has established a prima facie case of ineffective assistance of counsel. State v. Porter, 216 N.J. 343, 354 (2013). Such a showing is made where "the PCR claim has a reasonable probability of being meritorious." State v. Jones, 219 N.J. 298, 311 (2014).

Because the judge did not conduct oral argument, rendering a decision just on the briefs, we do not know what documentary evidence he considered. The judge's decision made no mention of our discussion of defendant's request for PCR. Essentially, the judge reasoned that if defendant was not denying his failure to pay the tax, no document would have helped him to convince the jury of his innocence. We disagree.

A-0268-19

The jury, according to the judge who decided the petition, found that defendant changed his return to married filing separately for the purpose of tax evasion, not for a legitimate reason. Had defendant produced the prenuptial agreement, and an expert, the jury may have declined to convict. The jury may have found that defendant's decision to file as married filing separately was a means of implementing his contractual commitment to his wife.

As we also noted in our earlier decision, the prosecutor's questioning of defendant, entirely legitimate, effectively destroyed his credibility. We said, "left unchallenged, defendant's uncorroborated testimony, much of which was arguably based on hearsay evidence, could have created reasonable doubt in the State's case. Of course, it is for just that reason that defendant's ineffective assistance claim may have merit if such documentation exists." Turner, slip op. at 13.

The PCR judge did not explain why even if the jury found defendant to be a credible witness, it would not have affected the verdict. If the jury considered defendant to be a credible witness, a view that would have been significantly bolstered by documentation, it may have "materially affected the jury's verdict." Marshall, 148 N.J. at 234.

A-0268-19

Defendant's testimony was his only proof. His credibility was absolutely key. He is therefore entitled to an evidentiary hearing in order to explore counsel's decision not to produce written corroboration of his claims and an expert witness.

In the absence of a hearing, counsel's preparation is not clear. Certainly, an hour and forty minutes in trial preparation does not seem like enough where the amounts in question were so substantial and arguably relate to circumstances beyond the ken of the average juror.

Reversed and remanded for a hearing.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0268-19