**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0223-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ISAIAH WILSON,

     Defendant-Appellant.

_____

Submitted April 30, 2025 – Decided June 25, 2025

Before Judges Currier and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment Nos. 14-01-0020, 14-04-0267, and 16-03-0177.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Abby P. Schwartz, Designated Counsel, on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Lauren P. Haberstroh, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from the July 18, 2023 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm.

During the investigation of a 2013 shooting of Mark Harris, police learned the car used in the shooting was registered to Zeneida Lemon, the mother of defendant's child. Lemon was interviewed on July 28, 2014. She stated that the Chevy Impala defendant frequently drove was registered to her. After the shooting, defendant suggested they trade in the Impala for a different car because it was connected to the shooting. Defendant did not tell her who else was in the car.

Lemon told the detectives that several months prior to this shooting, defendant got into an argument at a party and someone was shot. Then some weeks later, a person named "BoyBoy" was shot. She explained that BoyBoy is defendant's "[l]ike cousin/friend." When asked if defendant was targeting Harris, she replied, "[n]o he told me that he was cool with [Harris] for a long time but . . . the other person in the car felt in some type of way about him."

Detectives also interviewed Sean Taylor and summarized the conversation in a supplemental police report. Taylor stated he had known defendant for a long time. He also knew Harris. Taylor said he was in a basement apartment when defendant came in, and said he shot the wrong person. Taylor said

2

defendant was "hysterical," "mad," and "upset." Taylor explained defendant did not intend to shoot Harris but instead intended to shoot someone else to retaliate for the shooting of BoyBoy.

In January 2017, defendant pleaded guilty to charges under three indictments. This PCR petition arises out of an indictment in which defendant was charged with murder and other offenses after the fatal shooting of Harris. At the plea hearing, defendant pleaded guilty to count one of the indictment as amended from first-degree murder to first-degree aggravated manslaughter as an accomplice, N.J.S.A. 2C:2-6 and 2C:11-4(a).

During the 2017 plea hearing, defendant stated that on July 14, 2013, at around 3:00 a.m., he was driving a Chevy Impala and picked up "Baka" whose last name was McKaskill. Defendant testified he knew McKaskill was carrying a handgun. Defendant explained he and McKaskill agreed and planned to shoot rival gang members with whom they had a dispute. Defendant stated he knew someone "was going to get hit with . . . a bullet and . . . could die."

After defendant picked up McKaskill, he drove to a particular area where there were people standing on the sidewalk. Defendant pulled up to a stop sign, McKaskill opened the passenger side door and shot Harris. Defendant testified that Harris was not the intended target.

A-0223-23

The court sentenced defendant to twenty-three years on the aggravated manslaughter charge with an eighty-five percent parole ineligibility period under the No Early Release Act, N.J.S.A. 2C:43-7.2. He was sentenced to additional time on his guilty pleas to the other two indictments. The sentences all ran concurrent to each other and to a federal sentence defendant was currently serving.

Thereafter, defendant filed a pro se PCR petition asserting ineffective assistance of counsel in failing to investigate the case and inform defendant about the affirmative defense of duress. In the subsequent counselled brief, defendant contended that while driving that evening, he saw McKaskill walking. When defendant asked McKaskill where he was going, McKaskill

> suddenly jumped into [d]efendant's car, and told [d]efendant to drive because . . . [McKaskill] was looking for someone or anyone to shoot. Defendant tried to talk[] him out and said, "not in my car." This was when [McKaskill] pulled out a gun and threatened [d]efendant. [McKaskill] specifically stated, "I'm gonna kill someone, or shoot you, or else." Defendant and [McKaskill] drove for [twenty] seconds, and when they stopped at a STOP sign, [McKaskill] exited the car and shot the victim.
>
> [McKaskill] was a dangerous individual and had a reputation of shooting multiple persons. Defendant was afraid for his life when [McKaskill] threatened him, and [McKaskill] held a gun in his hands, as he sat in the passenger seat. Defendant's life was at risk if he

did not drive [McKaskill] around, and as such, [d]efendant was under duress.

The court heard counsels' arguments on the PCR petition on February 16, 2023. The court gave defendant additional time to file a reply brief. On February 28, defendant submitted an affidavit from Lemon, obtained on February 16. In the affidavit, Lemon stated:

> A couple of years ago, I was questioned about [defendant's] involvement in a deadly shooting that took place in my car. I informed the detectives that [defendant] told me that the car was involved in someone being shot and killed, but he never told me who that someone was. But he did tell me that the person who did the shooting "felt some type of way" about . . . [defendant] trying to stop him from doing the shooting. [Defendant] . . . said that the person who did the shooting "would not listen to him when [defendant] was telling him . . . not to shoot anyone." [Defendant] then said that the person was like "you can get it too, just drive." After being told this, [defendant] . . . shut down and was like "that was messed up what just went down."

Counsel presented additional arguments on May 30, 2023.

In an extensive oral decision issued July 18, 2023, the court denied the PCR petition. The court reviewed the parties' briefs and documents, including the plea hearing transcript.

The court addressed the defense of duress under N.J.S.A. 2C:2-9 and applicable case law. The court stated:

5

> [D]uress is an extremely rare defense. And in order for a defense counsel, at least in this [c]ourt's opinion, to raise or otherwise discuss and advise a defendant as to this defense, the attorney would have to hear from that client sufficient details to warrant such a discussion. There would have to be sufficient details coming from the defendant and/or the discovery to warrant a defense counsel further investigating this defense and to warrant discussions with the [p]rosecutor in plea negotiations and to ultimately result in a defendant making a decision after full consultation with defense counsel to go to trial with that defense.

The court noted that counsel did not support his assertions in the brief with a certification from defendant detailing the events.

The court concluded there was "absolutely nothing in the discovery which . . . ha[s] been provided to suggest a duress defense." The court recounted that Taylor said defendant was "distressed" that Harris was shot and defendant told him that "the wrong person" was shot. Defendant did not tell either Taylor or Lemon that he was threatened.

The court continued:

> [D]efendant finally provided some details from his own mouth as to the shooting in his final submission in June of 2023. He said that he told [defense counsel] details after the plea form was amended. But he said on the record [during the plea hearing] that he had spoken at length to his attorney and understood everything. [Defense counsel] described him at the sentence as helpful and intelligent and actively engaged in their discussions. There was no mention from . . . defendant

6

of any threats. As noted . . . defendant stated he had met [McKaskill] and agreed to put in some work, meaning shoot somebody.

The court also noted the "enormous" custodial exposure defendant faced and the "very favorable plea agreement."

The court further stated:

> With respect to . . . defendant's argument that [McKaskill] should have been interviewed, . . . defense counsel—whom again I do not believe was told of these threats in the first place—would have been asked to interview a person whom . . . defendant claimed had shot . . . Harris and threatened . . . defendant, at gunpoint in the car. I conclude strongly that no defense counsel would be in a position to realistically conduct such interview.
>
> As to the other persons referenced by . . . defendant, I have seen nothing to indicate that they ever said anything that would contribute to a duress defense. If . . . defendant had gone to trial and offered a duress defense, he would not have had the benefit of this plea agreement. If convicted of murder he would have, particularly with his criminal record, faced a minimum of [thirty] years without parole and up to life in prison. This would be apart from the custodial exposure on the other two indictments and the risk that any sentence would run consecutive to the federal sentence.
>
> . . . .
>
> I have already summarized . . . defendant's criminal record which was . . . very, very serious. I find it incredible to believe that this defendant—very experienced in the criminal justice system—would not

7

have told these critical details of alleged threats to him by [McKaskill] to [defense counsel] until just prior to the plea and that [defense counsel] would then have ignored it with no objection from . . . defendant when they went on the record "moments later" as . . . defendant put it. I note again that [defense counsel] referenced visiting. . . defendant in jail the day before and thoroughly reviewing everything with him.

In sum I conclude that there was no basis for [defense counsel] to investigate a duress defense. . . . [T]here is nothing in the discovery to indicate this. . . .

I strongly conclude that . . . defendant never raised this when he pled and he . . . never raised this . . . [when he] said he was satisfied with his . . . attorney or when he apologized to the victim's heartbroken family. He said he didn't mean for the person shot to be [Harris], but. . . never said he was threatened. . . .

I note . . . defendant waited for just days short of five years to file his pro se PCR petition. Never during that period was this claim raised to this [c]ourt or to any [c]ourt. I note again that . . . Lemon filed her affidavit just a few months ago and gave details that she had never given before and I believe that she would have given in an effort to help . . . defendant . . . with the police if he had told her this.

If . . . defendant had told her that he didn't want this to happen and that he had been threatened with a gun, I believe she would have told the detectives this when initially interviewed. I note . . . defendant had already admitted to her that he was in the car which she owned when the event happened. I believe again that she has attempted to help him now either out of fear, which she has expressed in the 2014 statement, or out of the fact that they have a son, or both. . . .

8

I conclude . . . finally that there has been no credible evidence presented of ineffective assistance of counsel. I do not see any errors on the part of [defense counsel] whatsoever. I do not see that a threshold has been reached to justify an evidentiary hearing. I do not see any errors which amount to a reasonable probability that but for such errors the outcome would have been different. . . .

. . . The petition is denied.

On appeal, defendant presents a sole point for our consideration:

DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS COUNSEL FAILED TO INVES[T]IGATE THE FACTS OF THE CASE AND FAILED TO ADVISE DEFENDANT OF THE AFFIRMATIVE DEFENSE OF DURESS.

The standard for determining whether counsel's performance was ineffective under the Sixth Amendment was formulated in Strickland v. Washington, 466 U.S. 668 (1984), and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42 (1987). To prevail on an ineffective assistance of counsel claim, defendant must meet the two-prong test establishing: (1) counsel's performance was deficient and they made errors so egregious that counsel was not functioning effectively as guaranteed by the Sixth Amendment; and (2) the defect in performance prejudiced defendant's right to a fair trial such that there exists a "reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 687, 694.

After our careful review, we are satisfied defendant's arguments lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2). We affirm substantially for the reasons expressed in the PCR court's well-reasoned oral opinion. Defendant did not establish a prima facie case of ineffective assistance of counsel and was not entitled to an evidentiary hearing.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0223-23